ANTONIO MARRERO CABRERA, Plaintiff and Appellee, v. CARIBBEAN REFINING CO., Defendant and Appellant.

No. R-63-279.     Decided March 15, 1966.

*McConnell, Valdés & Kelley, González, Jr., González-Oliver & Novak* for appellant. *Alberto Picó* and *José A. Suro* for appellee. *Lino J. Saldaña, Manuel Janer Mendía, Ramón R. Lugo, Eddie Gaud, Rafael Martínez Álvarez, Jr., Hernán C. Torres, Rafael Martínez Álvarez III, José A. Fernández Paoli, Hartzell, Fernández & Novas, Vicente Géigel Polanco,* and *Vicente Géigel Lanuza* as amici curiae.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

The Caribbean Refining Co. is engaged in the importation from overseas of raw petroleum which it later refines in the plant it has established in Bayamón to be used for local consumption and exportation. We are dealing, therefore, with an industry engaged in interstate commerce. The nature of its operation requires continuous around-the-clock work. This requires the distribution of work in three shifts of eight consecutive hours each. On June 5, 1955, it established a workweek for employees working in shifts which commenced at 11:01[1] on Sunday evening and ended 168 consecutive hours later, at 11:00 p.m. the following Sunday. Each period of 24 consecutive hours contained three shifts, to wit, No. 1, from 11:01 p.m. to 7:00 a.m.; No. 2, from 7:01 a.m. to 3:00 p.m.; and No. 3, from 3:01 p.m. to 11:00 p.m.

From June 5, 1955 until January 11, 1956 the shift schedule in use required the rendering of services during 5 consecutive days and thereafter the employees remained idle during the following two days.[2] Since this schedule pre-

---

[1] Eleven o'clock at night was chosen as the starting point for the workweek in order to avoid tardiness in view of the transportation facilities available in the area of Bayamón.

[2] The operations in the refinery commenced in April 1955 under an identical time schedule with the only difference that the week commenced and ended on Thursdays.

vented a great number of employees from enjoying the company of their family on weekends, a new working schedule was devised which consisted of 6 consecutive working days and 2 days of rest. On March 18, 1957 the enterprise and the Union incorporated this working system into the collective agreement executed at that time and which was in force at the time this claim was filed.[3] It may be readily noticed that since the shift was devised for 8 consecutive days, the rendering of services did not commence uniformly on the same day each week, and that the sixth consecutive day fell only twice within the workweek established by the enterprise in a period of eight weeks.[4] When this

---

[3] In addition to fixing wages for the different jobs, Art. V of the agreement contained the following clauses concerning overtime payment:

"(a) Any hour worked in excess of eight (8) hours daily within a period of twenty-four (24) consecutive hours shall be paid at time and a half (1½) the regular wage rate agreed.

"(b) Any hour worked in excess of forty (40) hours during a workweek (*as defined hereunder*) (but not on the seventh consecutive workday) shall be paid to the employee by the Company at time and a half (1½) the regular wage rate agreed.

"(c) Any hour worked during the seventh consecutive day shall be paid to the employee by the Company at double the regular wage rate fixed."

Article IV defined the workweek thus:

"For employees who work under the shift schedule, the workweek shall commence at the beginning of the shift established to start regularly Sunday on or before 12:00 p.m. and which ends the following Monday morning. The workweek shall consist of 168 consecutive hours which end the Sunday following the date of its commencement."

[4] The following diagram on the working schedule shall facilitate to understand what we have stated:

| Workweek: | S | M | T | W | T | F | S | Hours worked |
|---|---|---|---|---|---|---|---|---|
| (1) | x | x | x | x | x | x | o | 48 |
| (2) | o | x | x | x | x | x | x | 48 |
| (3) | o | o | x | x | x | x | x | 40 |
| (4) | x | o | o | x | x | x | x | 40 |
| (5) | x | x | o | o | x | x | x | 40 |
| (6) | x | x | x | o | o | x | x | 40 |
| (7) | x | x | x | x | o | o | x | 40 |
| (8) | x | x | x | x | x | o | o | 40 |
| (9) | x | x | x | x | x | x | o | 48 |

happened, the corporation paid the eight hours of the sixth day at time and a half; the other weeks were paid at the regular rate because, although the employees worked 8 hours daily in 6 consecutive days, the services were distributed in or charged to two different workweeks.

Briefly stated, the main controversy involved in this case boils down to determining what is meant by *workweek* in order to calculate the hours worked in excess of 40 weekly in an industry covered by the Federal Labor Standards Act, 29 U.S.C. §§ 201–219. This requires us to establish the moment when the workweek commences and ends for employees working in said industries.

The parties propose two solutions. The defendant suggests that we adopt the definition which appears in the federal administrative regulations, 29 C.F.R. 778.2 (c) and (d) (1964), which reads thus:[5]

"(c) *The workweek*. If in any workweek an employee is covered by the act and is not exempt from its overtime-pay requirements, the employer must total all the hours worked by the employee for him in that workweek (even though two or more

---

The fact that an employee changes from one shift to another does not alter the situation in order to determine the number of hours worked weekly.

[5] They are the counterpart of §§ 778.103–778.105 of the Interpretative Bulletin, as revised by the Office of the Administrator of the Federal Wage and Hour Division on February 2, 1965, 6A WHM 94:55.

This text prevails since February 4, 1950, on which date it substituted Interpretative Bulletin No. 4 issued November 1, 1938, the text of which— taken from the opinion rendered in *Pappas* v. *Kerite Co.*, 8 WH Cases 756— read thus:

"The 40-hour standard in Section 7 (a) is a limitation upon the number of hours that may be worked in any workweek free of time and one-half overtime compensation. A workweek consists of seven consecutive days. It need not coincide with the calendar week but may begin on any day and at any time of any day. The beginning of the workweek may be changed if the change is intended to be permanent and not to evade the overtime requirements of the Act."

See the rulings of the Administrator of December 1938 and December 1943 in 6A WHM 93:348 and 350.

unrelated job assignments may have been performed), and pay overtime compensation for each hour worked in excess of 40 in the workweek. An employee's workweek is a fixed and regularly recurring period of 168 hours—seven consecutive 24 hours period. It need not coincide with the calendar week but may begin on any day and at any hour of the day. For purposes of computing pay due under the Fair Labor Standards Act, the workweek may be established for the plant as a whole or different workweeks may be established for different employees or groups of employees within the plant. Once the beginning time of an employee's workweek is established, it remains fixed regardless of the schedule of hours worked by him. The beginning of the workweek may be changed if the change is intended to be permanent and is not designed to evade the overtime requirements of the act.

"(d) *Each workweek stands alone.* The act takes a single workweek as its standard and does not permit averaging of hours over two or more weeks. Thus, if an employee works 30 hours one week and 50 hours the next, he must receive overtime compensation for the overtime hours worked beyond the applicable maximum in the second week, even though the average number of hours worked in the two weeks is 40. This is true regardless of whether the employee works on a standard or swing-shift schedule and regardless of whether he is paid on a daily, weekly, biweekly, monthly or other basis. . . ."

The employees propose that we adopt that workweek means any period of seven consecutive days the commencement of which coincides with the beginning of the work in the shift of work, that is, at the beginning of the rendering of services by the employee on the first day of work after he returns from his two days of rest, and ends definitively 168 hours thereafter, when seven consecutive periods of 24 hours have elapsed. By analogy they invoke the ruling determining double compensation for work done during the day of rest which was laid down in *Ponce* v. *Fajardo Sugar Co.,* 85 P.R.R. 575 (1962) and *Compañía Popular* v. *Unión de Empleados,* 69 P.R.R. 167 (1948). It is readily seen that under the federal formula the workweek is a fixed and immovable

period; under the formula invoked by the employees the workweek changes every week and begins on a successive day during the different weeks. The trial court favored the latter.

I

In order to determine the basic question raised it is necessary to decide first whether the appellant, a corporation engaged in an activity in interstate commerce, is governed by the Provided clause of § 5 of Act No. 379 of May 15, 1948, 29 L.P.R.A. § 274, which we copy below, particularly in the light of our last interpretation in *Porto Rico Coal Co.* v. *Superior Court*, 91 P.R.R. 84 (1964). If it is not, we shall be at complete liberty to adopt the definition of workweek which we might deem to be most just and convenient, and which might, but not necessarily must, coincide with the so-called federal formula.

"Every employer who employs or permits an employee to work during extra hours shall be obliged to pay him for each extra hour a wage rate equal to double the rate agreed upon for regular hours; *Provided, however,* That every employer in any industry in Puerto Rico covered by the provisions of the Fair Labor Standards Act enacted by the Congress of the United States of America on June 25, 1938, as heretofore or hereafter amended, shall be under obligation to pay only for each hour of work in excess of the legal eight-hour working day, or in excess of forty (40) hours a week, a wage at the rate of not less than time and a half the rate of wage agreed upon for regular hours, save when by a decree of the Minimum Wage Board or by a collective labor agreement, other working and/or compensation standard is heretofore or hereafter fixed."

■ In *Olazagasti* v. *Eastern Sugar Associates*, 79 P.R.R. 88, 102 (1956), explaining the purpose sought by our Legislature in inserting the above-copied Provided clause, we said that it "shows on its face that the Legislature was endeavoring to write the federal formula for overtime pay, which was based on a *workweek,* into the local law [time

and a half for hours worked in excess of 40 a week] insofar as the latter applied to industries subject to the Fair Labor Standards Act." And we added that "the legislative history of Act No. 379 shows that the Provided clause was inserted 'to adjust' the local statute to the Federal law" so that the intention was not to extend the responsibility of the employers subject to the federal legislation beyond the provisions contained in the latter. A careful examination shows that the legislative intention was not reduced to reenacting the local formula concerning overtime for weekly pay, but it also sanctioned another exception in providing for time and a half pay for the hours worked in excess of 8 hours daily, for, as we know, the federal law contains no limitation whatsoever as to the working day.

■ The rule established in *Olazagasti, supra*, has been consistently followed in *Berríos* v. *Eastern Sugar Associates*, 79 P.R.R. 647, 656 (1956); *Laborde* v. *Eastern Sugar Associates*, 81 P.R.R. 468 (1959); *Ortiz* v. *Eastern Sugar Associates*, 85 P.R.R. 90, 95 (1962); *Pan American World Airways, Inc.* v. *Superior Court*, 86 P.R.R. 132 (1962), and *Bull Insular Line, Inc.*, v. *Superior Court*, 86 P.R.R. 148 (1962), and extended to cover not only the employers subject to *all* the provisions of the Fair Labor Standards Act, but also to those specified in any of the exemptions of § 7, 29 U.S.C. § 207, and to the case of the employees mentioned in § 13, 29 U.S.C. § 213, because the controlling factor is not that the individual job of the employee be covered by said law, but whether the industry within which the services are rendered is included within the coverage of the federal legislation as an activity of interstate commerce or in the production of goods for interstate commerce.

Now, by its very terms, the Provided clause is not applicable to the specific situations in which a Minimum Wage Board decree or a collective agreement fixes (1) another working standard; (2) another compensation standard;

and (3) or both. This takes us to considering certain pronouncements and expressions of the opinion rendered in the case of *Porto Rico Coal Co.* v. *Superior Court, supra.* It says: ". . . it is nonetheless true that there exist two exceptions in which the local formula and not the federal formula is applicable for overtime pay at double rate, the exceptions being: (1) when the wages corresponding to the industry have been fixed by decree of the Minimum Wage Board of Puerto Rico, and (2) when the wages have been agreed upon by the parties by virtue of a collective bargaining agreement. In said two exceptions the local law would always prevail. . . ." Hence, upon assimilating the minimum wages fixed in Act No. 96 of June 26, 1956, 29 L.P.R.A. § 245 *et seq.* (Supp. 1964, at p. 136 *et seq.*), to those decreed by the Minimum Wage Board, it might be concluded that an industry subject to the Federal Fair Labor Standards Act, whose minimum wage is included in the Minimum Wage Act, would not be governed by the Provided clause but by the "local formula."

During a long period covered by the claim, the relations between the corporation and its employees were governed by a collective agreement in which wages were fixed for the different classifications of work. Furthermore, pursuant to § 6(b) of the Minimum Wage Act, 29 L.P.R.A. § 245(e) (Supp. 1964, at p. 141), a minimum wage of one dollar is fixed in the industry of chemical products, of *petroleum* and related products, as the same is defined in § 37-O, 29 L.P.R.A. § 246(i) (Supp. 1964, at pp. 171–72).[6] That is why one of the amici curiae insists that The Caribbean Refining Co. cannot invoke the general rule of the Proviso of § 5, since in conformance with the language used in *Porto Rico Coal*, the mere fixing of a wage by collective agreement or by decree,

---

[6] A cursory examination of the documentary evidence reveals that at least during the period prior to January 1, 1956, the claimant's Dionisio Meléndez and William Díaz received wages less than $1.00 hourly.

See, 29 C.F.R. §§ 670.1–670.3.

and by interpretation, in the Minimum Wage Act of 1956, is sufficient for the industry to be governed, insofar as overtime pay is concerned, by the "local formula."[7]

It all boils down to a reexamination of the pronouncement that the compensation standard to which the final part of the Provided clause refers is satisfactorily met by merely fixing a wage rate contractually by agreement, administratively by decree, or legislatively in the Minimum Wage Act of 1956, as amended. Nothing more fitting than to make a brief survey of our labor laws from the beginning of the decade of 1940.[8]

In order to maintain the minimum standards of living necessary for the health, efficiency, and general well-being of workers, Act No. 8 of April 5, 1941 (Sess. Laws, p. 302), was approved and by virtue thereof a Minimum Wage Board was created with authority to approve mandatory decrees fixing, among other things, "the minimum wage rate for regular and extra periods of work, or for both," § 8, 29 L.P.R.A. § 218. The Act then in force and which regulated the hours of work was Act No. 49 of August 7, 1935 (Spec. Sess. Laws, p. 538). It was construed in an opinion rendered on May 18, 1943, in *Cardona* v. *District Court*, 62 P.R.R. 59 (1943), in the sense that it compelled the employer to pay the worker double time for the ninth hour of work during any regular day and regular pay for overtime in

---

[7] It is advisable to note that the opinion of *Porto Rico Coal* was confined to discarding compensation for time in excess of 8 hours daily at the rate of time and a half and ordered payment at double rate pursuant to § 4 of Act No. 379, on the ground that the general rule of the Provided clause was not applicable because it was included in the safeguard of fixing the wage by decree. It was nowhere decided in that case that the time worked in excess of 40 hours a week had to be paid at double time, for there is no local provision prescribing it. Under the so-called local formula the hours between 40 and 48 are paid at the regular rate, and only in the case of over 48 hours must payment be made at double time.

[8] In *Porto Rico Coal* the question was not specifically raised in the manner we are considering and analyzing it in the following paragraphs.

addition to said ninth hour. It was not until May 15, 1948 that Act No. 379 was approved establishing, in general terms, the working day of 8 hours and the workweek of 48 hours, and double pay for time worked in excess of the regular hours.[9] In § 22 thereof all the mandatory decrees issued by the Minimum Wage Board and which contained working conditions more beneficial to the workers were left in force, that is, a shorter working day or week or higher overtime pay. That is why upon enacting the safeguard of the industries covered by the Federal Fair Labor Standards Act, exception is made of the cases in which by decree or by agreement "other working and/or compensation standard is heretofore or hereafter fixed." This, therefore, responded to the authority that the Minimum Wage Board had not only to fix minimum wages for the different industries and activities, but also to fix compensation for overtime. When such was the case and the overtime compensation was higher than the time and a half rate, the decree would prevail over the standard of the Provided clause. See *Laborde* v. *Eastern Sugar Associates, supra. But it was always presupposed that the Board would actually fix a higher standard of compensation for overtime.*

The new Minimum Wage Act, Act No. 96 of June 26, 1956 represents a new public policy as to the intervention of the State in the formulation of the working standards and conditions. Evidently aware of the growth, development and vitalization of the labor organizations—propitiated by the Labor Relations Act, Act No. 130 of May 8, 1945, which recognizes and protects the rights of the employees to organize themselves, to bargain collectively, and to carry out

[9] Until then double pay for time worked in excess of the ninth hour daily or of 48 hours weekly was established by decree or collective agreement, except certain safeguards which need not be specified, such as, employees of public works.

activities for their own benefit—the Legislative Assembly prefers to limit the public action to the fixing of minimum wages, by the Legislature itself—§§ 6 to 9, 29 L.P.R.A. §§ 245e to 245h (Supp. 1964, at pp. 141–151), and by the Board, §§ 12 and 13, 29 L.P.R.A. §§ 245k and 245*l* (Supp. 1964, at pp. 154 and 155), leaving to the field of collective bargaining everything else referring to the fixing of the other working conditions, Journal of Proceedings, 1956, vol. 8 at p. 1065, among them, those relating to shorter working hours and a higher overtime pay than those established by Act No. 379. Thus we see that the law having limited itself, and since 1956 the decrees, merely to fixing a minimum wage, it was necessary that the agreement should have an affirmative action either by fixing shorter working hours or higher overtime compensation in order that the safeguard of the Provided clause should come into play. This conclusion is buttressed by the very fact that Act No. 379 is not a law of minimum wage, but of fixing the working hours. On the other hand, it is inescapable that "other compensation standard" may refer only to overtime pay, for § 5 seeks to fix a general standard and to that effect it begins: "Every employer who employs or permits an employee to work during *extra hours. . . ." It is not sufficient for any of the cases that a specific rate has been merely fixed or agreed.*

■ We therefore hold that in an industry subject to the Federal Fair Labor Standards Act, the compensation standard mentioned in the Provided clause requires that there be fixed by agreement or decree until 1956, and by agreement thereafter, a higher time and a half rate for hours worked in excess of 8 daily or 40 weekly. Insofar as it is incompatible with the ruling herein, the case of *Porto Rico Coal, supra,* should be considered expressly overruled.

It is advisable to make a summary of the standards which govern the industries covered by the Federal Fair

Labor Standards Act with respect to the working hours and overtime compensation in order to make clear once more any erroneous idea on such particulars. Here it is.

■ (1) The maximum working hours permitted in Puerto Rico for industries to which § 7(a) of the Federal Fair Labor Standards Act applies are 8 hours daily and 40 hours weekly, and any hour worked in excess of the 8 hours daily or 40 hours weekly shall be considered as overtime, and as such, subject to extra pay.

(2) Overtime worked in excess of 8 hours daily or 40 hours weekly in said industries shall be paid at time and a half the regular rate agreed.

■ (3) When by decree of the Minimum Wage Board— a situation which prevailed until June 26, 1956—or by collective agreement a workweek of less than 40 hours or a higher time and a half rate for overtime should have been or be fixed, or both, these standards shall prevail.

■ Coming back to the facts in the present case, it is evident that the appellant is governed by the Provided clause of § 5. This is so because (a) in the collective agreement executed March 18, 1957 a higher compensation standard of time and a half for extra hours was not fixed, as may be verified from Art. V which we copied in footnote 3 of this opinion; (b) there is no mandatory decree of the Minimum Wage Board prior to June 20, 1956 fixing a higher compensation standard for overtime in the petroleum industry and its by-products;[10] and (c) if § 7(a) of the Minimum Wage Board were applicable to Caribbean Refining Company, the sole fact of the legislative fixing of a minimum wage does not preclude the general standard of the Provided clause.

---

[10] Mandatory Decree No. 32, 29 R.&R.P.R. § 245n–541 *et seq.*, in force since October 25, 1957, was limited to fixing minimum wages for industries of chemical products, of petroleum, rubber and related products *for local commerce.*

■ Reference is made to the so-called "rule of greater benefit" elaborated pursuant to § 18 of the Federal Fair Labor Standards Act, 29 U.S.C. § 218.[11] A careful examination of Act No. 379 reveals that its provisions are not more beneficial than those of the Federal Act as to the fixing of the workweek and the overtime compensation. This is so because the federal workweek of 40 hours is less than the local workweek of 48, and because the same rate of time and one-half for hours in excess of 40 in the week was incorporated in the Provided clause of § 5 *as local law*. As to industries and activities subject to the Fair Labor Standards Act, our legislation is more beneficial in the following points: (a) hours in excess of 8 daily are considered and should be paid as overtime compensation at time and one-half (the federal legislation contains no provision as to payment of a higher rate for hours in excess of 8 daily); (b) hours in excess of 8 daily or in excess of 40 weekly shall be paid at the rate of double pay whenever it is so provided by a minimum wage decree or collective agreement.[12]

## II

The "workweek" is not defined by the federal law nor by Act No. 379. In the federal jurisdiction we have the administrative interpretation which we have already copied;

---

[11] "No provision of this chapter . . . shall excuse noncompliance with any . . . State law . . . establishing a minimum wage higher than the minimum wage established under this chapter or a maximum workweek lower than the maximum workweek established under this chapter, . . . ."

[12] It is significant that in the cases in which we have referred to the more beneficial legislation for the worker there has always intervened a decree in the fixing of wages and overtime compensation. *Peña* v. *Eastern Sugar Associates*, 75 P.R.R. 288 (1953); *Olazagasti* v. *Eastern Sugar Associates*, 79 P.R.R. 88 (1956); *Berríos* v. *Eastern Sugar Associates*, 79 P.R.R. 647 (1956); *Laborde* v. *Eastern Sugar Associates*, 81 P.R.R. 468 (1959).

in Puerto Rico, there are only available isolated expressions in opinions of this Court but relating to claims for work during a day of rest.[13] In *Commissioner of Labor* v. *District Court*, 74 P.R.R. 82, 98–99 (1952), we recognized that with respect to the workweek there should exist certain flexibility and that different circumstances could justify different solutions. We said:

"Section 4(d) of Act No. 379 of 1948 does not define a 'week.' A 'week' has been defined, by the general jurisprudence, in two ways, either a calendar week, indicating the period of seven days from Sunday to Sunday—[citations]—or the period of any seven consecutive days—[citations]—all of this in accordance with a determined statutory context and with the special situation involved. Section 2 of Act No. 379 itself provides that forty-eight hours of work constitute a workweek. *The context of the definition must depend on the actual relations prevailing between employers and workmen in a determined enterprise and in accordance with the special situation of each industry or economic activity.* It is neither necessary nor socially useful to adopt a stern formula. [citation] The text must be flexible and realistic. Different kinds of industries, establishments and enterprises may have different systems as to workweeks, from the point of view of accounting, payrolls, payment of wages, work shifts, hours of work, income, the nature of the work in itself and other elements concerning the relation with their workmen and the nature of the business or of the production process. . . ." (Italics ours.)

---

[13] Once more we reiterate the recommendation we made in *Deyá* v. *Otis Elevator Co.*, 91 P.R.R. 649 (1965), that the Secretary of Labor should adopt, under the powers vested in him by § 17 of Act No. 379, 29 L.P.R.A. § 286, the necessary regulation for the definition of certain terms of said Act and in relation to other problems which ordinarily arise in its administration. This helps to give stability to the management-labor relations and confidence to the investor in the standards which must be met in order to avoid unexpected claims in the future.

We take this opportunity to suggest the convenience of approving a provision similar to § 10 of the Portal to Portal Act, 29 U.S.C. § 259, by virtue of which an employer may set up as a defense in claims for wages, his good faith involving reliance on the rules, orders, rulings and written

Already in the course of this opinion we had indicated that by incorporating the Provided clause of § 5 of Act No. 379, it was the legislative intent "to conform" the local law to the federal statute, so that with respect to overtime compensation the responsibility of the employers covered by the Federal Fair Labor Standards Act should not extend beyond the provisions contained in the latter. In this way alone the objective could be achieved of placing these industries in a position to compete, without being in disadvantage, with enterprises established in the United States and which were engaged in the same activities. Any other more onerous standard meant a sure discouragement to attract them to Puerto Rican soil within the then incipient industrialization program. Although it could be adduced that they were being granted a privileged treatment, it is no less true that ultimately the additional sources of employment created thereby, coupled with higher salaries and less working hours which prevailed in those industries, adequately compensated the labor force of the country, which found a new horizon permeated with opportunities which otherwise would have never been theirs to reap and enjoy. The foresight of the lawmakers in 1948 has been amply confirmed by the economic progress of the Island, to which, in no small measure, the installation in Puerto Rico of industries covered by the Federal Fair Labor Standards Act has contributed.

Consistent with this purpose we do not see how it is possible to adopt for these industries a definition of workweek that might be different from the firmly-established concept in the interstate industries, and which from the beginning of the interpretation of the federal law was sanctioned

decisions of the governmental bodies charged with the administration of the labor laws, even if they be subsequently modified or set aside by judicial authority.

by administrative[14] and judicial[15] action. Indeed, it is inseparable from overtime and it is so identified with and indissolubly joined to the system that to attempt to formulate a different concept would defeat to a large extent the object pursued by the enactment of the Provided clause. For a clear understanding of the foregoing it suffices to read thoughtfully the text of § 7(a) of the federal law:

"Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate. . . ."

In order to determine the forty hours the unit of measure is the *workweek*. Ecker, *When Does Overtime Start*, 53 Dick. L. Rev. 201, 205 (1949). And in adopting the formula of time and a half in excess of 40 hours weekly, we likewise transplanted the unit of measure which was known to determine whether extra work had actually been done. We reached a similar result in *Bull Insular Line, Inc.* v. *Superior Court*, 86 P.R.R. 148, 155 (1962), when we said: "No argument has convinced us that our Legislature intended to adjust the local law to the Federal law, only in part, insofar as the payment of wages for overtime is concerned, and to exclude, in its attempt to adjust one statute to another, the work done by piece or unit of work." And already in *Peña* v. *Eastern Sugar Associates*, 75 P.R.R. 288, 304

---

[14] See preceding footnote 5 and Leiter, *The Principle of Overtime*, 2 Lab. L.J. 24 (1951).

As to the swing-shift schedule for industries of continuous operation, the Federal Wage and Hour Division approved a system similar to the one used by the Caribbean Refining Company. See 6A WHM 94:501.

[15] *Barclay* v. *Magnolia Petroleum Co.*, 203 S.W.2d 626 (Texas 1947); *Harned* v. *Atlas Powder Co.*, 192 S.W.2d 378 (Ky. 1946); *Sloat* v. *Davidson Ore Mining Co.*, 71 F.Supp. 1010 (Mich. 1942); *Pappas* v. *Kerite Co., supra.*

(1952) we had said that ". . . § 5 adopts the Federal standard of a 40 hour *workweek* for industries subject to the Federal Act."[16] Furthermore, it is significant that in the collective agreement signed by the parties they accepted the workweek devised and adopted by the corporation since the beginning of its operations.

■ Having concluded that the Provided clause of § 5 also incorporated the concept of the workweek of the federal law, it is unnecessary to decide whether the definition proposed by the appellee—traced from opinions in which we have only considered claims for the day of rest—[17] is the appropriate one. Yet, the case calls for certain comments.

The error of approach of those who maintain that the appellant should always pay overtime for work performed on the sixth consecutive working day—particular position which has not merited the administrative or judicial approval in the federal ambit, from which emerged the swing-shift system for a maximum workweek of 40 hours (see notes 14 and 15)—consists in mistaking the workweek—which is fixed and immovable for the corporation as well as for the employees—with the schedule of work which in essence consists of swing-shifts.[18] This error leads them to the untenable position of referring to a week of 8 days, in their endeavor that the commencement of the workweek should always coincide with the moment work is started. What merely happens

---

[16] *Quiñones Rosa* v. *Fajardo Development Co.*, 90 P.R.R. 665 (1964), is distinguishable since the industry involved therein was subject to the Federal Fair Labor Standards Act to which were applicable the provisions of a local decree concerning overtime, an exception recognized by the Provided clause itself. Therefore, we were at liberty to adopt the interpretation which we deemed to be the most adequate for our local formula.

[17] It is not amiss to note that for the purposes of the day of rest the test is based on the "days," while for the purposes of the Provided clause of § 5 it is based on the "hours," 40 hours weekly.

[18] The federal administrative regulation, 29 C.F.R. 778.2 (d) (1964) expressly admits the coincidence of one fixed workweek with a swing-shift schedule.

is that certain shifts fall within two different workweeks. It is convenient to reiterate that the shift schedule established in the industry was adopted at the request of the employees in order to give every employee the opportunity of spending some weekends with his family, something which would have been impossible when the corporation operated on fixed shifts.[19] It may be readily noticed that under the system of fixed shifts which prevailed until January 1956, the Company was not bound to pay overtime, but with the new system adopted it had to pay every employee, at least, 16 extra hours every eight weeks.

As we have stated, the solution we have reached rests on our interpretation of the scope of the legislative intention in approving the Proviso of § 5. In making a clear distinction in the case of industries covered by the Federal Fair Labor Standards Act, a public policy emerged in the structure of which the lawmaker unquestionably considered not

---

[19] We copy from the testimony of the Vice-President of the corporation:

"Q. And what happened on January 11, 1956?
A. The shift schedule was changed.
Q. Why was the change made?
A. The main reason was to give swing-shifts to the employees so that they could have different free days." (Tr. Ev. p. 40.)

.    .    .    .    .    .    .    .

"Q. Can you tell us, Mr. Cays, why was the change made on January 11, 1956?
A. The change in the shift schedule arose from a . . . as a result of a petition from our employees.
Q. What sort of petition was it, Mr. Cays?
A. With the four shifts in use, one of the groups had Saturdays and Sundays or the weekends free all the time. Under that schedule one of the groups always had Saturdays and Sundays free. The other groups working never had the opportunity of enjoying the weekends or Saturdays and Sundays free, so we could not see any objection to that petition." (Tr. Ev. pp. 41–42.)

.    .    .    .    .    .    .

"A. Actually our employees worked the schedule themselves." (Tr. Ev. p. 93.)

only the factor of an adequate salary for the Puerto Rican employee, but also others just as important which are reflected in the economic well-being of the Island. In approaching these problems we cannot blindly attempt to read our personal preferences in the statute nor solely stress one criterion, but we must situate them within the whole picture of circumstances in order to determine the true legislative intent.

## III

■ Finally, the appellants maintain that in shift No. 1 —11:01 p.m. to 7:00 a.m.—they worked during the seven calendar days and therefore they have the right to double pay for the hours worked during the seventh calendar day. To obtain this, they cleverly fraction the first shift: the first hour, from 11:01 p.m. to 12 p.m. constitutes a day of work, and the remaining seven hours, from 12:01 a.m. to 7:00 a.m. constitute a separate day of work. The trial court also favored this position.

In this field the local interpretation prevails exclusively because it deals with our statute which grants to the employee additional benefits. In *Ponce* v. *Fajardo Sugar Co.*, 85 P.R.R. 575 (1962), we established a definition of the concept "workweek" for the purpose of fixing "the exact moment when the period of 24 consecutive hours of rest referred to in Acts Nos. 289 of 1946 and 379 of 1948 begins to run, or, otherwise stated, at what exact moment terminates the sixth consecutive day of work referred to in Act No. 289." In this last respect we indicated that it is necessary to start from the commencement of the work in the first period following the period of rest, and this sixth period does not commence, as a question of law, before the 120 hours nor ends 144 hours after the commencement of the working day of the first period.

In the case of the workers who worked in shift No. 1, the work ended at 7:00 a.m. of a specific day, and he did not return to work on shift No. 2 until 7:01 a.m., *two days later*. It may be readily conceived that between both shifts there elapsed a continuous period of more than 24 consecutive hours.

From the foregoing it is concluded that defendant-appellant does not owe the appellees any amount for overtime. The judgment rendered by the Superior Court, San Juan Part, on October 18, 1963 will be reversed and the complaint dismissed.

Mr. Justice Belaval dissented in part in a separate opinion in which Mr. Chief Justice Negrón Fernández concurs as well as Mr. Justice Hernández Matos and Mr. Justice Santana Becerra.

Mr. Justice Santana Becerra dissented in part in a separate opinion in which Mr. Chief Justice Negrón Fernández, Mr. Justice Belaval and Mr. Justice Hernández Matos join.

—O—

MR. JUSTICE BELAVAL, with whom MR. CHIEF JUSTICE NEGRÓN FERNÁNDEZ, MR. JUSTICE HERNÁNDEZ MATOS, and MR. JUSTICE SANTANA BECERRA concur, dissenting.

San Juan, Puerto Rico, March 15, 1966

The Superior Court of Puerto Rico, San Juan Part, found proved the following facts in this case: Respondent-appellant, a petroleum refinery established in the city of Bayamón, started operations in 1955 in an industry engaged in interstate commerce which, because of the nature of its industrial process, is forced to work continuously during seven days a week, twenty-four hours daily.

When it started operations respondent-appellant established a workweek which started at eleven o'clock p.m. of the corresponding Sunday and ended a hundred and sixty-eight

consecutive hours later (24 x 7 = 168), that is, at eleven o'clock the following Sunday night. Within that workweek the respondent-appellant established a daily shift schedule which extended, the first one from eleven o'clock the preceding night until seven o'clock the following morning (8 hours); the second, from seven in the morning until three in the afternoon of the same day (8 hours), and the third, from three in the afternoon until eleven o'clock at night of the same day (8 hours).

From June 5, 1955 to January 11, 1956, respondent-appellant put in operation a continuous work schedule according to the shifts indicated and during a workweek of forty hours its employees worked five consecutive days of eight hours (5 x 8 = 40) and rested for two consecutive days. From January 11, 1956 until March 18, 1957, the continuous work schedule was changed and the laborers worked from Thursday to Thursday, six consecutive days of eight hours (6 x 8 = 48) and rested two consecutive days. From and after March 18, 1957, the respondent-appellant and the Union which represents the petitioners-appellees signed a collective agreement adopting the schedule agreed on January 11, 1956.

As conclusions of law, the trial court added: According to the provisions of the Federal Fair Labor Standards Act and § 778.2 of the Regulation of said Act, the employer's workweek is a fixed and regular period of 168 hours, that is, seven consecutive periods of twenty-four hours each. The employer's workweek does not have to coincide with the calendar week, but, both the day and the hour in which it starts shall be fixed permanently, independently of the employee's work shift, although the day on which the employer's workweek starts can be changed if the change is not made for the purpose of evading the payment of extra hours. Likewise, pursuant to said § 778.2, every 40-hour workweek of the laborer stands by itself and shall be considered as a week independent of the one following and it is not permitted to

take more than one week to determine, by average, the number of hours worked. For example, an employee or laborer who works 30 hours a week and 50 hours the following week, shall receive additional compensation for the 10 hours worked in excess of 40 during the second week, even though the average for the two weeks be 40 hours. Albeit the Federal Fair Labor Standards Act permits a laborer to work 24 consecutive hours in a day, without paying extra hours, provided said 24 hours daily fall within the limit of 40 hours of the laborer's workweek; it also recognizes as being more beneficial to the laborer the limit of 8 hours daily that a state law may establish, as does Act No. 379 to establish a workweek in Puerto Rico, on May 15, 1948. Both Acts can be reconciled by permitting the laborer to work five days of eight hours, that is, 40 hours a week.

By virtue of Act No. 289 of April 9, 1946, all workers not covered by the provisions of the closing law of § 553 of the Penal Code of Puerto Rico were granted a day of rest after each six days of work, and if the employer wants the employee to work on his day of rest, he shall compensate those hours at double the regular rate agreed. According to the ruling of this Court in *Compañía Popular* v. *Unión de Empleados*, 69 P.R.R. 167, 183–186 (Snyder) (1949), the regular workweek begins the first day after the employee receives his regular day of rest. If the workweek begins the day immediately after the day of rest, the workweek in an industry covered by the federal law ends when the laborer has worked 40 hours, that is, if said 40 hours weekly are worked in periods of eight hours a day, those hours worked after the fifth day are extra hours and the employer shall be bound to pay them at time and a half pursuant to the *Provided* clause of § 5 of Act No. 379 of 1948.

The week established by the respondent is in some aspects in harmony with the workweek provided by Act No. 379 of May 15, 1948, but, upon combining the shift schedule of

six consecutive work days with two days of rest in a fixed week of seven days, from Sunday to Sunday, the inevitable outcome of that work program is a violation to the labor health plan contemplated by Act No. 289 of April 9, 1946, establishing the day of rest. On the other hand, the sixth consecutive day fell only twice within the workweek in a period of eight weeks. In its practical application and regarding the limitations imposed by Act No. 379 of May 15, 1948, the workweek established by the respondent-appellant consists of six days of eight hours each (48 hours) and not of five days of eight hours (40 hours), which week of 40 hours is the one authorized by the Fair Labor Standards Act and the *proviso* of § 5 of Act No. 379 of May 15, 1948.

By virtue of said conclusions the trial court ordered respondent-appellant to file a draft judgment compensating the hours worked during the sixth day, counted from the day immediately following the day of rest, at a rate of time and a half, and the hours worked by petitioners on the day of rest, that is, on the seventh day, at double time.

The conclusions of law of the San Juan Part are entirely correct pursuant to the provisions of Act No. 289 of April 9, 1946, Act No. 379 of May 15, 1948, and our labor case law, as we shall see hereinafter.

The proposition that, because it deals with an industry covered by the Federal Fair Labor Standards Act, the question should be decided in part pursuant to the provisions of the federal administrative regulation—29 Code of Federal Regulations § 778.2(c) and (d) (1964), revised up to January 1, 1965—which contains the following definition of what constitutes a "workweek," has been submitted to our consideration:

"(c) *The workweek.* If in any workweek an employee is covered by the act and is not exempt from its overtime-pay requirements, the employer must total all the hours worked by the employee for him in that workweek (even though two or

270

more unrelated job assignments may have been performed), and pay overtime compensation for each hour worked in excess of 40 in the workweek. An employee's workweek is a fixed and regularly recurring period of 168 hours [that is], seven consecutive 24-hour periods. It need not coincide with the calendar week but may begin on any day and at any hour of the day. For purposes of computing pay due under the Fair Labor Standards Act [federal], the workweek may be established for the plant as a whole or different workweeks may be established for different employees or groups of employees within the plant. Once the beginning time of an employee's workweek is established, it remains fixed regardless of the schedule of hours worked by him. The beginning of the workweek may be changed if the change is intended to be permanent and is not designed to evade the overtime requirements of the act.

"(d) *Each workweek stands alone.* The act takes a single workweek as its standard and does not permit averaging of hours over two or more weeks. Thus, if an employee works 30 hours one week and 50 hours the next, he must receive overtime compensation for the overtime hours worked beyond the applicable maximum in the second week, even though the average number of hours worked in the two weeks is 40. This is true regardless of whether the employee works on a standard or swingshift schedule and regardless of whether he is paid on a daily, weekly, biweekly, monthly or other basis. The rule is also applicable to pieceworkers and employees paid on a commission basis. It is therefore necessary to determine the hours worked and the compensation earned by pieceworkers and commission employees on a weekly basis."

We must first decide whether said regulation, which derives its authority from the (Federal) Fair Labor Standards Act, governs in Puerto Rico.

The first time we had to pass upon the conflict or the coexistence of the Federal Fair Labor Standards Act and the local laws—*Chabrán* v. *Bull Insular Line,* 69 P.R.R. 250, 273–274 (Snyder) (1948)—we left the rule of interpretation clearly established, that upon approval of § 18 of the Fair Labor Standards Act, the Congress of the United States "made it clear that it was not preempting the field of stand-

ards relating to wages and hours in interstate commerce. It gave the States freedom of action to establish higher standards than those contained in the Federal Act. State legislation is superseded by the Fair Labor Standards Act only if the local statute provides lower standards than the Federal Act. The committee reports are consistent with the construction of the Act. These reports are quoted in part in C.C.H. Labor Law Service, par. 26,800, as follows:

'Section 16 of the Committee amendment provides that no provision of the act is to justify noncompliance with any other Federal or State law or municipal ordinance establishing a higher minimum wage *or a shorter maximum workday* or workweek than that established under the act, and that no provision of the act relating to the employment of child labor is to justify noncompliance with any Federal, State, or municipal ordinance establishing a higher standard than the standard established under the act. H.R. Rep. No. 2182, page 15, April 21, 1938, 75th Cong. 3d Sess.

'Section 18 which deals with the relation of the act to other laws follows the corresponding provision of the House amendment with the addition of a provision to the effect that nothing in the act is to be deemed as any justification for a reduction in wages or a lengthening of hours. Conference Committee Rep. No. 33, page 2738, June 11, 1938, 75th Cong., 3d Sess. . . .'

"The silence of § 18 on the subject of state statutes providing for maximum workdays does not mean that Congress intended to supersede such local legislation. On the contrary, as the House Report indicates, such Acts continued in effect. No specific reference was made to them in § 18, precisely because the Federal Act contains no provisions with respect to a maximum workday. The Congress deemed it unnecessary to provide a saving clause for state legislation on a subject not included in the Federal Act."

The established rule keeps a sound analogy with the good judicial policy of the Supreme Court of the United States and the Supreme Court of Puerto Rico, in the sense that even though the federal legislation "covers the same field" as the Puerto Rican legislation, the coexistence of both statutes is possible: *Puerto Rico* v. *Shell Co.*, 302 U.S. 253, 261–264, 82 L.Ed. 235, 242–244 (Sutherland) (1937), in the absence of an express prohibition from Congress in the Federal Act in question regarding any other state or territorial legislation.

Without this brief legislative and doctrinary antecedent, there would be no explanation for the drafting of the famous *Provided* clause of § 5 of Act No. 379 of May 15, 1948, the object of such abundant interpretation on our part, which provides: "Every employer who employs or permits an employee to work during extra hours shall be obliged to pay him for each extra hour a wage rate equal to double the rate agreed upon for regular hours; *Provided, however,* That every employer in any industry in Puerto Rico covered by the provisions of the Fair Labor Standards Act enacted by the Congress of the United States of America on June 25, 1938, as heretofore or hereafter amended, shall be under obligation to pay only for each hour of work in excess of the legal eight-hour working day, or in excess of forty (40) hours a week, a wage at the rate of not less than time and a half the rate of wage agreed upon for regular hours, save when by a decree of the Minimum Wage Board or by a collective labor agreement, other working and/or compensation standard is heretofore or hereafter fixed. To determine the wage rate agreed upon for regular hours of work, the daily, weekly, or monthly wages, or wages otherwise stipulated, shall be divided by the number of regular hours worked during that same period in accordance with the provisions of this Act." Pursuant to § 3 of the same Act: "Regular hours of work are eight hours during any period of twenty-four consecutive hours, forty-eight hours during any

week, and two hundred and eight hours during any month; *Provided, however*, That the Commissioner of Labor shall cause to be published every year in newspapers of general circulation in the Island, a notice stating the exact number of regular hours of work during each month of the year, in conformity with the number of working days and hours according to the calendar and legislation in force as regards legal holidays. . . ."

The doctrine in *Chabrán* that the Act which shall be applied is that which most benefits the employee or laborer in those work contracts in which different provisions of the Fair Labor Standards Act and of our local laws could be applicable was followed in *Peña* v. *Eastern Sugar Associates*, 75 P.R.R. 288, 303, 304 (Snyder) (1953), in which we decided: "As we have seen, the Federal rule is that where a *Belo* contract fails the 'regular rate' per hour is determined by dividing the weekly salary by the total number of hours actually worked during that particular week. But § 7 and the last sentence of § 5 of Act No. 379 change this rule, to the benefit of the employee, by providing that under these circumstances the divisor is the number of hours constituting the regular workweek. The defendant does not disagree. It asserts, however, that 48 hours is the regular workweek provided by §§ 2 and 3 of Act No. 379. It therefore argues that the impact of Act No. 379 requires the use of 48 hours as the divisor in a frustrated *Belo* contract.

"We would unhesitatingly agree with this contention of the defendant that 48 hours, as the regular workweek established by §§ 2 and 3 of Act No. 379, would be the divisor if the plaintiff had been employed in a local industry. The difficulty is that the *Provided* clause in § 5 lays down a different rule for industries subject to the Federal Act. With possible exceptions not relevant here, § 5 adopts the Federal standard of a 40 hour workweek for industries subject to the Federal Act. Consequently, as a general proposition, § 5

and the Federal Act, when read together, operate to make 40 hours the regular workweek for the industrial phase of the sugar business during the grinding season. And paragraph B(2)(b) of Mandatory Decree No. 3 and the Federal Act achieve the same result for the dead season, see *Caguas Bus Line* v. *Commissioner of Labor*, 73 P.R.R. 690. This contrasts with the other provisions of Act No. 379 which make 48 hours the regular workweek for local industry. It follows that, under the mandate of § 7 and the last sentence of § 5 of Act No. 379, the divisor here—the regular workweek—is 40, not 48, hours.

"In view of the foregoing, we agree with the plaintiff and hold that the regular hourly rate of pay for each week in which overtime is owed must be obtained by dividing the weekly guarantee by 40 hours."

The *Chabrán* case was followed also in the decision of *Olazagasti* v. *Eastern Sugar Associates*, 79 P.R.R. 88, 97, 106 (Marrero) (1956). The main question raised in the decision of Olazagasti was whether the processing exemption granted by § 207(c) of the Federal Fair Labor Standards Act—29 U.S.C. § 207(c)—to the employers engaged in the processing of sugarcane into sugar was validly set aside by Act No. 379 of May 15, 1948 and Act No. 289 of April 9, 1946, these last two referring to the working hours and the day of rest in Puerto Rico. Petitioner was a mechanic among whose duties were those of repairing and keeping in good working order the mill of the defendant's sugar factory. As such he was within the exemption established by § 207(c) of the Federal Fair Labor Standards Act: *Maneja* v. *Waialua Agri. Co.*, 349 U.S. 254, 270–271; 99 L.Ed. 1040, 1056 (Clark) (1955).

Copying literally from the text of the opinion entered in *Olazagasti*, it would read: "The trial court did not hold expressly that the exemption granted by the Federal Act was rendered ineffective by Act No. 379 *supra*. What the

court did hold was that both legal provisions coexist in different fields of action, and that this is possible by virtue of another provision of the Federal Act *supra*, which reads thus:

'No provision of sections 201–219 of this title [Federal Fair Labor Standards Act] or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under such sections or a maximum workweek inferior to the maximum workweek established under such sections. . . . No provision of sections 201–219 of this title shall justify any employer in reducing a wage paid by him which is in excess of the applicable minimum wage under sections 201–219 of this title, or justify any employer in increasing hours of employment maintained by him which are shorter than the maximum hours applicable under such sections. . . .'

"We may say, without fear of being mistaken, that in enacting that provision the United States Congress made evident its intention to prevent that, on the authority of the Federal Fair Labor Standards Act, the working standards of higher level prevailing throughout the states or territories of the Union be reduced. In the case at bar, the standard established by the Federal Congress consisted in exempting plaintiff from the advantages of the federal statute. This does not mean, however, that he was necessarily deprived of legal protection. In *Chabrán* v. *Bull Insular Line*, 69 P.R.R. 250, the facts were different from those of the present case, but the principle there announced is applicable here. In that case we stated at p. 270:

'. . . Congress did not preempt the field of standards relating to wages and hours of employees working in interstate commerce. It could have barred local legislation on any phase of the subject-matter. See *Latoni* v. *Municipal Court*, 67 P.R.R. 130. But instead of prohibiting local statutes,

Congress affirmatively provided, perhaps out of an abundance of caution, in § 18 of the Fair Labor Standards Act that states could provide a higher minimum wage or a shorter maximum workweek than that established by the Act.'

"The question remains, however, whether our Legislature, in adopting § 5 of Act No. 379, did in fact provide for overtime pay at the rate of time and a half after 40 hours during the grinding season for employees who, like plaintiff, would otherwise be exempt during the grinding season from the overtime provisions of the Federal Act by virtue of § 7(c) of the latter.

"As we pointed out in footnote 10, p. 304 of the *Peña* case, one way to agree with the defendant is for us in effect to read into the *Provided* clause of § 5 the phrase, 'where overtime pay is required by Federal law.' This would, of course, mean that we were not following the literal language of the statute. But if we are satisfied that the Legislature did not intend its language to be read literally, it is our duty, wherever the language lends itself fairly to such an interpretation, to read it in accordance with the intention of the Legislature." [Citations.] The opinion continues.

"The *Provided* clause of § 5 of Act No. 379 shows on its face that the Legislature was endeavoring to write the Federal formula for overtime pay, which was based on a workweek, into the local law, insofar as the latter applied to industries subject to the Fair Labor Standards Act. This view is fortified by the provision that *only* time and a half must be paid, whereas local industries under other sections of the Act must pay double time after 8 hours a day. The use of the word 'only' makes it seem unlikely that the Legislature intended to expand the employer's liability beyond that provided in the Federal Act; yet that would be the effect of reading the *Provided* clause as excluding the seasonal exemption provided in § 7(c) of the Federal Act. In

addition, the legislative history of Act No. 379 shows that the *Provided* clause was inserted 'to adjust' the local statute to the Federal law. We do not have before us the entire legislative history. However, in a certificate which is filed of record it appears that after the President of the Senate announced that S.B. 25 (which thereafter became Act No. 379 of 1948) had been unanimously approved on a third reading and directed that it be referred to the House of Representatives, Senator Pagán, explaining the affirmative vote which he had just cast stated as follows:

'I shall vote for the law with the amendment proposed by Mr. Géigel Polanco, but I do not agree with the statement that the law be amended to conform it to the Federal Act.

'The legislative power of our Legislature to establish the original rate provided in the Bill is an incontrovertible fact. As established by the Legislature, it is not incompatible in any way with the Federal Act. Neither is it a myth that we have full power and authority to do so. . . .'

"In this context, 'to conform' could mean only that the *Provided* clause of § 5 of Act No. 379 was providing substantially the same overtime pay for a workweek as the Federal Act, including exemption therefrom during the grinding season as provided in § 7(c)."

And it continues:

"This intention of the Legislature was not fully accomplished. The terms of § 7 and the last sentence of § 5 of our law require the use of 40 hours as the regular workweek— rather than the hours actually worked as provided in the Federal law—in calculating the overtime pay of an employee under a frustrated Belo contract. This results in giving such an employee more overtime pay under Act No. 379 than he would receive under the Federal Act. *Peña* v. *Eastern Sugar Associates, supra.* It must be admitted that the provision in Act No. 379 of a more beneficial method of calculating over-

time pay for a frustrated Belo contract than is found in the Fair Labor Standards Act weakens the argument that the Legislature intended in the *Provided* clause of § 5 to restate not only the Federal formula for time and a half after 40 hours a week but also the Federal seasonal exemption from such overtime pay embodied in § 7(c) of the Federal Act. Nevertheless, we think a strong argument can still be made—from (1) the language of the *Provided* clause, (2) the use of the word 'only,' and (3) its legislative history —for the proposition that the *Provided* clause, standing alone, can be read as retaining rather than, in effect, eliminating the seasonal exemption of § 7(c) of the Federal Act from overtime pay insofar as a workweek is concerned. But we need not rely on the *Provided* clause of § 5 alone to reach this result. Section 22 of Act No. 379 provides 'all the terms' of the Minimum Wage Act and the mandatory decrees promulgated pursuant thereto 'shall remain in full force and effect.' In interpreting § 22 we have held that, with one exception, it preserves the provisions of all existing decrees, irrespective of whether they contain provisions superior or inferior to those found in Act No. 379. [Citations.]" So the opinion continues:

"Par. B(2)(b) of Mandatory Decree No. 3 provides that:

'No employer shall employ a worker in the industrial phase of the Sugar Industry during the so-called "dead season," for more than forty (40) hours in any workweek, unless such worker receives compensation for the hours worked in excess of the said forty (40) hours at a rate one and one-half times the minimum rate applicable in accordance with the scale established in Section B-1 of this decree.'

"When this decree was approved in February 1943, § 7(c) of the Federal Act, as we have seen, exempted certain employees, like the plaintiff, from the overtime provisions of the Federal Act during the grinding season. It is therefore obvious that, by confining the overtime provision of time

and a half after 40 hours a week in Par. B(2)(b) to the dead season, Mandatory Decree No. 3 was in effect 'adopting' the Federal seasonal exemption as a matter of local law."

We have quoted in the greatest extent compatible with the nature of this type of work the doctrinary aspect of the *Olazagasti* case, because undoubtedly it has been one of the best rendered decisions but least understood of our labor case law. In the case of Olazagasti, taking as radical § 18 of the Federal Fair Labor Standards Act, the principle of what could be called the rule of the greatest benefit was established, in the sense that if one provision of the Federal Fair Labor Standards Act conflicts with a standard of our local law, the one most beneficial to the laborer would prevail.

It is necessary, preeminently, to bear in mind that the Federal Fair Labor Standards Act is a statute adopted for the protection of the laborer. The declaration of policy of said Act is clear: 2(a) "The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce.

"(b) It is declared to be the policy of this chapter, through the exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct and as rapidly as practicable to eliminate the

conditions above referred to in such industries without substantially curtailing employment or earning power."

As it may be seen, the Congress of the United States, upon regulating fair labor standards in the industries and businesses comprised within interstate commerce, never had the intention of establishing uniform labor standards which, when applied to all states and territories, would render ineffective the legislations promulgated for said states and territories, but of establishing certain basic federal standards, leaving the legislatures of the states and territories free to adopt the additional standards permissible within their respective economies. It is not the first time that the socio-economic inequalities between the states of the Union, compels the Congress of the United States to employ this legislative method.

The wisdom of allowing the coexistence of some basic federal standards with additional standards of greater benefit of state or territorial character has its best example in the case of Puerto Rico, a very special case within the structures of the Public Law of the United States of America. The formula of the Puerto Rican inventive has been to adopt as a specialty within the framework of its general local legislation, the basic federal standards regarding the extension of the regular workweek (40 hours), overtime compensation (time and a half), to be applied exclusively to the industries and businesses included within interstate commerce not otherwise regulated by some Mandatory Decree of the Minimum Wage Board of Puerto Rico or by collective agreement.

In the case of Olazagasti we did not even have to apply the more beneficial rule provided by § 18 of the Federal Fair Labor Standards Act because, pursuant to § 7 (c) of said Act, the task performed by Olazagasti during the grinding season was exempted from the application of the Federal Fair Labor Standards Act. This left the field open for our

labor Act, in the first place, to par. B-2 (b) of Mandatory Decree No. 3 of February 27, 1943 of our Minimum Wage Board, in the sense that its determinations would not be applied to the time worked during the grinding season; in the second place, to the *Provided* clause of § 5 of our Act No. 379, in the sense that by said *Provided* clause it was sought to place our local Act and the federal formula on the same footing in regard to the regular workweek and overtime compensation in those industries or businesses engaged in interstate commerce not covered by a mandatory decree or by a collective agreement, and thirdly, to § 22 of our Act No. 379, in the sense that said § 22 was aimed at maintaining in all its effect the mandatory decrees prior to our Act No. 379 of May 15, 1948 and, taking into consideration only the picture administrative determination and legislative intention represented by par. B-2 (b) of Mandatory Decree No. 3 and §§ 5 and 22 of Act No. 379 we reached the conclusion that since Mandatory Decree No. 3 meant to continue the exemption during the grinding season as established by § 7 (c) of the Federal Fair Labor Standards Act and, inasmuch as the purpose of § 22 of Act No. 379 is to keep in all their effect the mandatory decrees prior to Act No. 379 as well as those which followed it, such workers or employees who had worked overtime during the grinding season did not have a right to receive compensation for such extra hours, pursuant to the *Provided* clause of § 5 of Act No. 379. It may be noted that in referring to the mandatory decrees we have included those prior as well as subsequent to Act No. 379, since the exemption of the *Provided* clause of § 5 establishes as a safeguard to the general application the case of the Minimum Wage Board Decree in which it *is fixed* heretofore —past perfect—or hereafter—denoting the future imperfect —that is, prospective or future action, for according to the grammar of the Real Academia Española, the future imperfect views the action as incomplete and always as contingent

either to the present or to the future it authorizes the inclusion of decrees prior as well as subsequent to Act No. 379. It should also be kept in mind that any *exclusion* of a group of work or industry established by the Federal Fair Labor Standards Act could not render ineffective any *inclusion* established by the labor legislation of any state or territory, because the inclusion being more favorable to the laborer than the exclusion the more beneficial rule of § 18 of the Federal Fair Labor Standards Act itself would prevail and, therefore, we should praise the wisdom of the decision in the Olazagasti case which searched for the solution not in the simple federal exclusion, but also in the more encompassing, although not less efficient because of it, of the non-inclusion of the state or territorial law.

The case of *Berríos* v. *Eastern Sugar Associates*, 79 P.R.R. 647, 649–650, 654–659 (Marrero) (1956) in which a seaman was expressly exempted under § 218 of the Federal Fair Labor Standards Act of its minimum wage and workweek and overtime provisions, is decided along the same procedure of the *Olazagasti* case: The seaman is excluded from the provisions of the Federal Fair Labor Standards Act (page 656) and the case is studied under our local legislation, that is, combining the provisions of par. B-2 (a) of Mandatory Decree No. 3 with the proviso of § 5 of Act No. 379 of May 15, 1948, fixing the working hours in Puerto Rico, by virtue of which we concluded that forty hours constituted the regular workweek of the petitioner; that during the "dead season" the hours worked by Berríos in excess of forty a week should be compensated at time and a half and that during the "grinding season" the hours in excess of forty a week should be compensated at the regular rate (pages 658–659).

The case of *Laborde* v. *Eastern Sugar Associates*, 81 P.R.R. 468, 472–473 (Belaval) (1959) in which a caretaker of a telephone system operated by a sugar mill which allegedly was included within the exemption provided by § 7 (c)

of the Federal Fair Labor Standards Act and as such excluded from the benefits of the weekly day of rest provided by our Act No. 289 of April 9, 1946 and of the working hours established by our Act No. 379 of May 15, 1948, reaffirms the principle of the *Olazagasti* case in the sense that in every possible conflict between the Federal Fair Labor Standards Act and our local laws, the law most beneficial to the laborer shall prevail. The decision in *Laborde* reads: "As to whether the exemption of processing provided by § 7(*c*) of the Fair Labor Standards Act is applicable to this case, a comparative study of the provisions of the Fair Labor Standards Act and the provisions of our different local laws on labor contract has convinced us that our local laws are more beneficial than the federal statute. Therefore, pursuant to § 18 of the same Fair Labor Standards Act, we should apply our local laws, in this case Act No. 49 of 1935, Mandatory Decree No. 3 of the Minimum Wage Board of Puerto Rico reconciled with the provisions of Act No. 289 of 1946, and Act No. 379 of 1948: *Olazagasti* v. *Eastern Sugar Associates*, 79 P.R.R. 88, 108 (Marrero) (1956). The Legislature of Puerto Rico has not deemed it advisable to establish the total exemption for the industrial phase of our sugar industry contained in the Federal Act, providing progressively for a less exhaustive daily and weekly job for the businesses exempted by the Federal Act. There are abundant climatological, social, and human reasons which justify the difference if such justification be necessary."

Maybe it would be advisable to remember here the declaration of policy of our Act No. 379 of May 15, 1948, upon establishing the more beneficial rule in favor of the laborer, very much similar, in a remedial sense, to the declaration of policy of the Federal Fair Labor Standards Act. The declaration of policy of our Act No. 379 reads: "This Act consecrates the principle of the limitation of the working day—one of the great labor vindications. It is a measure for the

effective protection of the health, safety, and life of the laborer. Excessively long working days produce fatigue, increase the frequency of labor accidents, and weaken the vigour of the body, exposing it to ailments and disease. They also deprive the laborer of the time necessary for relaxation and for the cultivation of his mind and of his social and civic relations. . . .

"Upon the mechanization of work and the rationalization of industrial organization, production has considerably increased, but the effort of the laborer, now compelled to render his services with machines and under techniques that require the highest skill and unflagging attention, has also increased. Nothing more natural then that the benefits of mechanized agriculture and rationalization should reach the laborer in the form of a more humane working day.

"It is the policy of this Act to limit to a maximum of eight hours the legal working day in Puerto Rico, and to provide payment of double time for the hours worked in excess of the legal working day. . . .

"It is hereby declared that the policy of this Act is, through the exercise of the power of the Legislature of Puerto Rico, to enact laws for the protection of the life, health, and safety of employees and workmen, to correct, and as rapidly as possible to eliminate, the condition of labor exploitation on the basis of overlong working days, substantially to increase the opportunities for employment, and to provide better compensation for the employees in those cases where the employer extends the working day."

The decisions in the cases of *Chabrán, Olazagasti, Berríos*, and *Laborde*, created a legal situation which may be summarized as follows: The Legislature of Puerto Rico having adopted as part of its labor statute the only basic general standards originally applicable to Puerto Rico, because up to the moment those decisions were entered our country was expressly excluded from the application of the federal mini-

mum wage, and as the other conditions of the work contract provided by our labor laws proved more beneficial to the laborer or employee, it is unquestionable that to every industry or business engaged in interstate commerce or in the production of goods for interstate commerce, our local laws are applicable in all matters referring to the labor contract, and only in reference to such fringe benefits, upon comparing both legislations where the provisions of the Federal Fair Labor Standards Act would be more beneficial to the laborer or employee, would the latter govern for such particular situation.

Nevertheless, we have to recognize that in view of this legal situation, our case law, probably because of a lack of concern regarding the use of the radicals more adequate to the question or because some of the judges who subscribed with their votes said opinions changed their mind, a different thesis has been under structure in relation to the application of the federal act with the exclusion of the Puerto Rican law. The matter is serious enough, especially at the present moment, to deserve an exhaustive analysis of the question.

The opposite result has been accomplished by extracting from the opinion in *Olazagasti, supra* at 102, the following statement: "The *Provided* clause of § 5 of Act No. 379 shows on its face that the Legislature [of Puerto Rico] was endeavoring to write the Federal formula for overtime pay, which was based on a workweek, into the local law, insofar as the latter applied to industries subject to the Fair Labor Standards Act. This view is fortified by the provision that *only* time and a half must be paid, whereas local industries under other sections of the Act must pay double time after 8 hours a day. The use of the word *only* makes it seem unlikely that the Legislature intended to expand the employer's liability beyond that provided in the Federal Act; yet that would be the effect of reading the *Provided* clause as excluding the seasonal exemption provided in § 7(*c*) of the

Federal Act. In addition, the legislative history of Act No. 379 shows that the *Provided* clause was inserted 'to adjust' the local statute to the Federal law. . . ."

I consider necessary here a short incursion into semantics to leave duly clarified the two words which seem to have been the key to the new interpretation, the words "reenact" and "adjust." It is unquestionable that the former belongs to the special terminology of the legislative process, taken from the English language, and it means to promulgate a law again. This makes us suspect that in the methaphorical manner in which it is used in the case of Olazagasti, it simply means "to adopt," as it was employed in the case of *Peña* v. *Eastern Sugar Associates*, 75 P.R.R. 288, 305–306 *in fine*, (Snyder) (1953). Thus, the first part of the statement quoted is supposed to express, by simple substitution, that: "The *Provided* clause of § 5 of Act No. 379 shows on its face that the Legislature of Puerto Rico was endeavoring to *adopt* the federal formula into the local law." We do not give special significance to it within the legal terminology because as the Legislature of Puerto Rico does not have authority to reenact an Act of the Congress of the United States, its semantic use is dominated by the figurative acception. The latter, on the contrary, is a Spanish word and it seems to be used in the only two acceptions the word has: to adjust as "to moderate," "to temper," first acception, or as "to accommodate one thing to another," second acception, in this latter case, a federal legislation to a territorial legislation.

The case of *Ortiz* v. *Eastern Sugar*, 85 P.R.R. 90, 91, 96 (Per Curiam) (1962), is the case of four seamen who worked on board the tugs of the Eastern Sugar Associates transporting sugarcane from the Island of Vieques to Punta Santiago, in Humacao. Petitioners alleged that as such seamen they were not covered by the Federal Fair Labor Standards Act and, not being covered by said Act, even

though the tasks performed by said seamen were included in the definition of maritime transportation contained in subd. R of § 37 of Act No. 96 of June 26, 1956 (Minimum Wage Act), they were not included in any mandatory decree and, therefore, the provided clause of § 5 of Act No. 379 of May 15, 1948 which is the one authorizing compensation at time and a half for the hours in excess of eight a day, as Eastern Sugar had paid them, was not applicable to their case, but § 4(a) of the latter Act which classifies as overtime the hours worked in excess of eight hours daily and those provisions of § 5 which provide the general standard that overtime shall be compensated at double time.

Passing upon the question of law raised, this Court concluded: "The difficulty that lies in the position assumed by appellants is that, as inferred from the opinions in *Olazagasti* v. *Eastern Sugar Associates*, 79 P.R.R. 88 (1956), and *Berríos* v. *Eastern Sugar Associates*, 79 P.R.R. 647 (1956), the test for applying the *Provided* clause of § 5 of Act No. 379 is not whether the particular work performed by the workman is covered by the Federal Fair Labor Standards Act, but whether or not the industry to which he renders these services is covered thereby. And in the instant case, whether considered as part of the industrial phase of the sugar industry or as part of the shipping-transportation industry, the tasks performed by the complainants come within the ambit of the federal legislation because they are activities of the interstate commerce or in the production of articles for interstate commerce. Section 1 of the Federal Fair Labor Standards Act, 29 U.S.C.A. § 201, *Berríos* v. *Eastern Sugar Associates, supra* at p. 654. It only follows that the tasks performed by the complainants are covered by the Federal Act, but that the provisions of that Act on minimum wage and workday, §§ 6 and 7 (29 U.S.C. §§ 206 and 207), are not applicable thereto by virtue of the exemption provided by par. 14 of § 13 *supra*. It is well to recall

here that in *Olazagasti, supra,* we stated that the intention of the Legislative Assembly of Puerto Rico in enacting the *Provided* clause of § 5 of Act No. 379 was that the Federal Fair Labor Standards Act should govern in Puerto Rico with all its provisions, including all the exemptions provided therein, with the exception of imposing on the employers in industries covered by the said Federal Act the obligation to pay to their employees time and a half for the hours worked in excess of eight hours a day." It goes without saying that the careful and cautious language we used in *Olazagasti* does not entitle to such a gross generalization of the legislative intentions.

The case of *Bull Insular Line* v. *Superior Court,* 86 P.R.R. 148, 150 (Pérez Pimentel) (1962), is the case of some stevedores who worked in the loading of sugar on board of ships consigned or belonging to the Bull Insular Line, an industry covered by the Federal Fair Labor Standards Act, during the period between July 1947 and November 1956, under collective agreeements negotiated during the employment. Petitioners worked in excess of eight hours daily and for said overtime they were compensated at time and a half and not at double time.

On the basis of the *Provided* clause of § 5 of Act No. 379, applicable to industries or businesses in Puerto Rico covered by the Federal Fair Labor Standards Act, the Court decided: "In *Olazagasti* v. *Eastern Sugar Associates,* 79 P.R.R. 88, we said that the legislative history of Act No. 379 shows that the *Provided* clause of § 5 was inserted in said Act to adjust the local statute to the Federal law. In that way the industries in Puerto Rico engaged in interstate commerce were placed in the same competitive footing as those industries of the United States also covered by the Federal Fair Labor Standards Act and which are only required to pay time and one half for extra hours worked. No argument has convinced us that our legislature intended to adjust the local

law to the Federal law, only in part, insofar as the payment of wages for overtime is concerned, and to exclude, in its attempt to adjust one statute to another, the work done by piece or unit of work. On the contrary, we hold that the *Provided* clause of § 5 of Act No. 379 is applicable to the industries in Puerto Rico covered by the Federal Fair Labor Standards Act in the case of a labor contract in which the wage is stipulated per day, week, or month, as when it is agreed that the work be done by the piece or other unit of work." Once again we have to take exception regarding the fact that the careful and cautious language of our previous decisions, that of *Olazagasti* among them, does not authorize such a gross interpretation of the doctrine established by our labor legislation.

The case of *Pan American* v. *Superior Court*, 86 P.R.R. 132, 134, 139 (Blanco Lugo) (1962), deals with some employees of an air carrier requesting compensation at double time for the overtime worked within the daily periods of twenty-four hours, of the hours worked in excess of forty-eight hours weekly, the hours worked on the weekly day of rest, during the time comprised between years 1948 and 1958, pursuant to the provisions of Act No. 379 of May 15, 1948, 29 L.P.R.A. § 271 *et seq.*, fixing the legal working hours in Puerto Rico, and of Act No. 96 of June 26, 1956, 29 L.P.R.A. § 245 *et seq.*, (Supp. 1961), regarding the fixing of minimum wages. The collective agreements provide for a working day of eight hours during five consecutive days a week. Regarding overtime pay and the hours worked in excess of eight hours daily or forty hours weekly being considered overtime, it is provided in the agreements that they shall be paid at time and a half the regular rate per hour, even though the hours in excess of twelve daily or of eight during the sixth day of work, or during the seventh day, shall be compensated at double time. Petitioners having accepted that they were paid according to the terms of the

contract, the only thing subject to litigation is "whether the time worked in excess of eight hours daily up to twelve, or in excess of forty a week up to forty-eight, should be paid at the rate of time and one half, as alleged by the defendant, or at double time, as maintained by the claimants."

The issue in question boiled down to determining whether the Railway Labor Act or our Act No. 379 of May 15, 1948 was applicable to the employees' claim. Upon dismissing the applicability of the Railway Labor Act and passing upon the applicability of § 5 of our Act No. 379 of May 15, 1948, it was held by this Court: "As we stated in *Olazagasti* v. *Eastern Sugar Associates*, 79 P.R.R. 88, 102 (1956), 'the *Provided* clause of § 5 of Act No. 379 shows on its face that the Legislature was endeavoring to write the Federal formula for overtime pay, which was based on a workweek, into the local law, insofar as the latter applied to industries subject to the Fair Labor Standards Act,' and that '[it] was inserted "to adjust" the local statute to the Federal Law.' In other words, the Federal Fair Labor Standards Act prevails in Puerto Rico with all its provisions, except that our Legislative Assembly imposed on the employers covered by said Act or included within the exemptions of § 13, 29 U.S.C.A. § 213, the obligation to pay to their employees the time worked in excess of eight hours daily and forty hours weekly, at least, at time and a half, or, at a higher rate, if it was so provided by a collective agreement negotiated by the parties or by a decree of the Minimum Wage Board applicable to the industry in question. *Olazagasti* v. *Eastern Sugar Associates, supra; Berríos* v. *Eastern Sugar Associates*, 79 P.R.R. 647 (1956); *Ortiz* v. *Eastern Sugar Associates*, 85 P.R.R. 90 (1962); *Bull Insular Line* v. *Superior Court, post*, p. 148, decided today.

"From the foregoing it may be inferred that for the purposes of Act No. 379, the defendant, as carrier by air engaged in interstate and foreign commerce, is an industry

subject to the provisions of the Federal Fair Labor Standards Act. This is so even though the carriers by air subject to the Railway Labor Act have been expressly exempted from the provisions of § 7 thereof (29 U.S.C.A. § 207), which establishes a maximum working day of 40 hours weekly by means of § 13(b)(3), 29 U.S.C.A. § 213(b)(3). In *Ortiz v. Eastern Sugar Associates, supra,* we stated that the test for the application of the *Provided* clause of § 5 of Act No. 379 is not whether the particular work performed by a laborer is covered by the aforesaid Federal Act, but whether the industry within which he renders services is covered or not. As we have pointed out previously, the fact that the industry is exempt from the provisions of § 7, does not exclude it from the Proviso of Act No. 379. . . .

"In brief, the Federal Railway Labor Act does not preclude the application of the local legislation concerning the working day to carriers by air, but by virtue of the proviso of Act No. 379 said industry—in the absence of a collective agreement or a decree of the Minimum Wage Board establishing better standards—is only bound to pay the time worked in excess of eight hours daily or forty hours weekly at the rate of time and one half."

The case of *The Porto Rico Coal Co.* v. *Superior Court,* 91 P.R.R. 84, 86 (Belaval) (1964), is the case of some seamen who worked from June 26, 1956 to August 31, 1961, in the service of transportation, freight, towing, transferring or steering of the ships operated by both companies. Said seamen were exempt from the provisions of the Federal Fair Labor Standards Act, and regarding the *proviso* of § 5 of our Act No. 379 of May 15, 1948 the same is not applicable, according to the laborers, because it is an industry covered, concerning their minimum wage, by § 37-R of Act No. 96 of June 26, 1956 (p. 720)—29 L.P.R.A. § 246i (Cum. Supp. 1963, at p. 182)—and § 6(f) added to said Act No. 96 by

§ 1 of Act No. 103 of June 25, 1958 (p. 241)—29 L.P.R.A. § 245e(f) (Cum. Supp. 1963, at p. 147).

Passing upon the objection of the companies in the sense that the *Provided* clause of § 5 exempts only those cases in which by mandatory decree of the Minimum Wage Board or by agreement, another standard is fixed to compensate overtime and § 6(b) of the Minimum Wage Act is neither a decree nor an agreement, this Court declared: "It is unquestionable that the exemption of the industry by the Fair Labor Standards Act plays no role in this case. As we have seen, the only consequence a federal exemption has is to leave the field open to local legislation, because the local inclusion is more beneficial than the federal exclusion. No matter how the *Provided* clause of § 5 of Act No. 379 of May 15, 1948 should be applied, in a situation like the present case, it performs the function of a local law. Then the payment for each hour of work in excess of the legal working day of eight (8) hours, or in excess of the forty (40) hours a week shall be at the rate of, at least, time and a half the rate of wage agreed upon for regular hours, 'save when by a decree of the Minimum Wage Board or by a collective agreement, other working [hours] and/or compensation [wages] standard is heretofore or hereafter fixed, or both [hours and wages].' Notice that the decree of the Board or the collective agreement may regulate exclusively the hours of work or the wages, or both.

"In reality of law the only question for decision in this case is whether the fact that the Legislature of Puerto Rico fixed the wage rate alters the situation covered by the last exception of the *Provided* clause of § 5. Since the standard was established by the same authority which creates the Minimum Wage Board, it is as compulsory as a decree of said Board and according to the context of § 5 itself which permits the fixing of working (hours) or compensation (wages) standards, the case is not unusual or its construc-

tion constrained. In this case the working hours are those established by the *Provided* clause of § 5 which is our local law for industries covered by the Federal Fair Labor Standards Act, and the minimum wage the one established by the Legislature of Puerto Rico, in § 6 (f) added to the Minimum Wage Act of Puerto Rico by Act No. 103 of June 25, 1958, that is, at the rate of $1.00 per hour of work, and the extra hours should be paid as if it were an industry covered by decree, that is, at the double rate."

For the purposes of this study it is convenient to relate some of the provisions of the 1938 Federal Fair Labor Standards Act, using for such relation the historic-evolutive method. We dispense with the declaration of policy for it was already included in this opinion.

Pursuant to § 3 (b) of Public Law No. 718 of June 25, 1938 of the Congress of the United States, better known as Fair Labor Standards Act of 1938—52 U.S. Statutes at Large, 1060–1069; 83–8 Congressional Record 9159, 9163, 9165, 9179, 9246, 9257—the word "commerce" means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof; pursuant to § 3 (c) of the same Act, the word "state" means any State of the United States or the District of Columbia or any Territory or possession of the United States; according to § 3 (h), the word "industry" means a trade, business, industry, or branch thereof, or group of industries, in which individuals are gainfully employed; according to § 3 (i ) of the same Act, "goods" means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof; § 3 (j) defines "produced" means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of

goods if such employee was employed in producing, manu-
facturing, mining, handling, transporting, or in any other
manner working on such goods, or in any process or occu-
pation necessary to the production thereof, in any State.

Section 5 (a) of that Act provides that the Administrator
—referring to the Administrator of the Wage and Hour
Division of the United States Department of Labor—shall as
soon as practicable appoint an industry committee for each
industry engaged in commerce or in the production of goods
for commerce and (b) it shall include a number of dis-
interested persons representing the public, one of whom the
Administrator shall designate as chairman, a like number of
persons representing employees in the industry, and a like
number representing employers in the industry, and in the
appointment of the persons representing each group, the
Administrator shall give due regard to the geographical
regions in which the industry is carried on, two-thirds of
the members of an industry committee shall constitute a
quorum and the decision of the committee shall require a vote
of not less than a majority of all its members and it is before
this committee that the Administrator shall submit data he
may have on the matters referred to it, and it shall cause
to be brought before it in connection with such matters any
witness whom he deems material, without this depriving the
committees of the faculty to summon other witnesses or call
upon the Administrator to furnish additional information to
aid in its deliberations.

Section 6 of said Act establishes the periodical increase
of initial *minimum* wage up to forty cents an hour and § 7
establishes the progressive reduction of the workweek up to
forty hours. Section 8 (a) provides that with a view to carry-
ing out the policy of this Act by reaching, as rapidly as is
economically feasible without substantially curtailing em-
ployment, the objective of a universal *minimum* wage of 40
cents an hour in each industry engaged in commerce or in

the production of goods for commerce, the Administrator shall from time to time convene the industry committee for each such industry, and the industry committee shall from time to time recommend the *minimum* rate or rates of wages to be paid under § 6 by employers engaged in commerce or in the production of goods for commerce in such industry or classifications therein; and paragraph (b) of § 8 established that upon the convening of an industry committee, the Administrator shall refer to the question of the minimum wage rate or rates to be fixed for such industry, and the industry committee shall investigate conditions in the industry and the committee, or any authorized subcommittee thereof, may hear such witnesses and receive such evidence as may be necessary or appropriate to enable the committee to perform its duties and functions under this Act, and shall recommend to the Administrator the highest *minimum* wage rates for the industry which it determines, having due regard to economic and competitive conditions, will not substantially curtail employment in the industry; paragraph (c) of § 8 provides: The industry committee for any industry shall recommend such reasonable classifications within any industry as it determines to be necessary for the purpose of fixing for each classification within such industry the highest minimum wage rate not in excess of 40 cents an hour which (1) will not substantially curtail employment in such classification and (2) will not give a competitive advantage to any group in the industry, and shall recommend for each classification in the industry the highest *minimum* wage rate which the committee determines will not substantially curtail employment in such classification. In determining whether such classifications should be made in any industry, in making such classifications, and in determining the *minimum* wage rates for such classifications, no classification shall be made, and no minimum wage rate shall be fixed, solely on a regional basis, but the industry committee and the Administrator

shall consider among other relevant factors the following: (1) competitive conditions as affected by transportation, living, and production costs; (2) the wages established for work of like or comparable character by collective labor agreements negotiated between employers and employees by representatives of their own choosing; and (3) the wages paid for work of like or comparable character by employers who voluntarily maintain minimum-wage standards in the industry, and no classification shall be made under this section on the basis of age or sex.

Section 18 of said Act establishes that no provision of this Act or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this Act or a maximum workweek lower than the maximum workweek established under this Act, and no provision of this Act relating to the employment of child labor shall justify noncompliance with any Federal or State law or municipal ordinance establishing a higher standard than the standard established under this Act. No provision of this Act shall justify any employer in reducing a wage paid by him which is in excess of the applicable *minimum* wage under this Act, or justify any employer in increasing hours of employment maintained by him which are shorter than the maximum hours applicable under this Act.

The Joint Resolution of June 26, 1940 of the Congress of the United States, 54 United States Statutes at Large 615–616, amended § 5 of the Fair Labor Standards Act of 1938 by adding the following paragraph (e), at the end thereof: No industry committee appointed under subsection (a) of this section shall have any power to recommend the *minimum* rate or rates of wages to be paid under § 6 to any employees in Puerto Rico or in the Virgin Islands. Notwithstanding any other provision of this Act, the Adminis-

trator may appoint a special industry committee to recommend the *minimum* rate or rates of wages to be paid under § 6 to all employees in Puerto Rico or the Virgin Islands, or in Puerto Rico and the Virgin Islands, engaged in commerce or in the production of goods for commerce, or the Administrator may appoint separate industry committees to recommend the *minimum* rate or rates of wages to be paid under § 6 to employees therein engaged in commerce or in the production of goods for commerce in particular industries. An industry committee appointed under this subsection shall be composed of residents of such island or islands where the employees with respect to whom such committee was appointed are employed and residents of the United States outside of Puerto Rico and the Virgin Islands. In determining the *minimum* rate or rates of wages to be paid, and in determining classifications, such industry committees and the Administrator shall be subject to the provisions of § 8 and no such committee shall recommend, nor shall the Administrator approve, a minimum wage rate which will give any industry in Puerto Rico or in the Virgin Islands a competitive advantage over any industry in the United States outside of Puerto Rico and the Virgin Islands. Paragraph (d) provides that: No wage orders issued by the Administrator pursuant to the recommendations of an industry committee made prior to the enactment of this joint resolution pursuant to § 8 of the Fair Labor Standards Act of 1938 shall after such enactment be applicable with respect to any employees engaged in commerce or in the production of goods for commerce in Puerto Rico or the Virgin Islands.

The aforementioned joint resolution also amended § 6 (a) of the Fair Labor Standards Act of 1938, regarding minimum wages, adding to § 6 (a) thereof the following: If such employee is a homeworker in Puerto Rico or the Virgin Islands, *not less* than the *minimum* piece rate prescribed by

regulation or order; or, if no such minimum piece rate is in effect, any piece rate adopted by such employer which shall yield, to the proportion or class of employees prescribed by regulation or order, not less than the applicable *minimum* hourly wage rate. Such *minimum* piece rates or employer piece rates shall be commensurate with, and shall be paid in lieu of, the *minimum* hourly wage rate applicable under the provisions of this section. The Administrator, or his authorized representative, shall have power to make such regulations or orders as are necessary or appropriate to carry out any of the provisions of this paragraph, including the power without limiting the generality of the foregoing, to define any operation or occupation which is performed by such homework employees in Puerto Rico or the Virgin Islands; to establish *minimum* piece rates for any operation or occupation so defined; to prescribe the method and procedure for ascertaining and promulgating *minimum* piece rates; to prescribe standards for employer piece rates, including the proportion or class of employees who shall receive not less than the minimum hourly wage rate; to define the term "homeworker"; and to prescribe the conditions under which employers, agents, contractors, and subcontractors shall cause good to be produced by homeworkers.

By virtue of Public Law No. 393 of October 26, 1949, better known as 1949 amendments to the Fair Labor Standards Act—2 U.S. Code Congressional Service 1617–1628 First Session 1949, 63 United States Statutes at Large 910–920 —§ 2 (b) of the Fair Labor Standards Act of 1938 is amended to read as follows: It is hereby declared to be the policy of this Act, through the exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power; § 3 (b) thereof is amended to read as follows:

"Commerce" means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof; § 3(j) is amended to read thus: "Produced" means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State.

Public Law No. 393 of October 26, 1949 also amended § 5(a) of the Fair Labor Standards Act of 1938, to provide as follows: The Administrator shall as soon as practicable appoint a special industry committee to recommend the *minimum* rate or rates of wages to be paid under § 6 to employees in Puerto Rico or the Virgin Islands, or in Puerto Rico and the Virgin Islands, engaged in commerce or in the production of goods for commerce, or the Administrator may appoint separate industry committees to recommend the minimum rate or rates of wages to be paid under § 6 to employees therein engaged in commerce or in the production of goods for commerce in particular industries. An industry committee appointed under this subsection shall be composed of residents of such island or islands where the employees with respect to whom such committee was appointed are employed and residents of the United States outside of Puerto Rico and the Virgin Islands. In determining the *minimum* rate or rates of wages to be paid, and in determining classifications, such industry committees and the administrator shall be subject to the provisions of § 8; §§ 6(a) and 6(c) of the Fair Labor Standards Act are likewise amended; the former in the sense that the *minimum* wage established by the statute shall be not less than 75 cents an hour and the latter in

the sense that said minimum wage shall be superseded in the case of any employee in Puerto Rico or the Virgin Islands engaged in commerce or in the production of goods for commerce only for so long as and insofar as such employee is covered by a wage order heretofore or hereafter issued by the Administrator pursuant to the recommendations of a special industry committee appointed pursuant to § 5: *Provided*, That the wage order in effect prior to the effective date of this Act for any industry in Puerto Rico or the Virgin Islands shall apply to every employee in such industry covered by subsection (a) of this section until superseded by a wage order hereafter issued pursuant to the recommendations of a special industry committee appointed pursuant to § 5.

Section 7(a) of the Fair Labor Standards Act was amended by Public Law No. 393 of October 26, 1949 to establish the following: Except as otherwise provided in this section, no employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed, and subsection (e) of § 7 was amended by the same Public Law to provide that: No employer shall be deemed to have violated subsection (a) by employing any employee for a workweek in excess of forty hours if such employee is employed pursuant to a bona fide individual contract, or pursuant to an agreement made as a result of collective bargaining by representatives of employees, if the duties of such employee necessitate irregular hours of work, and the contract or agreement (1) specifies a regular rate of pay of not less than the *minimum* hourly rate provided in § 6(a) and compensation at not less than one and one-half times such rate for all hours worked in excess of forty in any workweek, and (2) provides a weekly guaranty of pay

for not more than sixty hours based on the rates so specified.

Section 8(a) of the Fair Labor Standards Act of 1938 is amended by Public Law No. 393 of October 26, 1949 in the following manner: The policy of this Act with respect to industries in Puerto Rico and the Virgin Islands engaged in commerce or in the production of goods for commerce is to reach as rapidly as is economically feasible without substantially curtailing employment the objective of the *minimum* wage prescribed in paragraph (1) of § 6(a) in each such industry, for which the Administrator shall from time to time convene an industry committee or committees, appointed pursuant to § 5, and any such industry committee shall from time to time recommend the *minimum* rate or rates of wages to be paid under § 6 by employers in Puerto Rico or the Virgin Islands, or in Puerto Rico and the Virgin Islands, engaged in commerce or in the production of goods for commerce in any such industry or classifications therein; subsection (b) of § 8 is amended thus: Upon the convening of any such industry committee, the Administrator shall refer to it the question of the *minimum* wage rate or rates to be fixed for such industry, and said committee shall investigate conditions in the industry and the committee, or any authorized subcommittee thereof, may hear such witnesses and receive such evidence as may be necessary or appropriate to enable the committee to perform its duties and functions under this Act, and the committee shall recommend to the Administrator the highest *minimum* wage rates for the industry which it determines, having due regard to economic and competitive conditions, will not substantially curtail employment in the industry, and will not give any industry in Puerto Rico or in the Virgin Islands a competitive advantage over any industry in the United States outside of Puerto Rico and the Virgin Islands; subsection (c) of § 8 is amended to provide the following: The industry committee shall recommend such reasonable classifications within any industry

as it determines to be necessary for the purpose of fixing for each classification within such industry the highest *minimum* wage rate (not in excess of that prescribed in paragraph (1) of § 6(a)) which will not substantially curtail employment in such classification and will not give a competitive advantage to any group in the industry, and shall recommend for each classification in the industry the highest *minimum* wage rate which the committee determines will not substantially curtail employment in such classification, and in determining whether such classifications should be made in any industry, in making such classifications, and in determining the *minimum* wage rates for such classifications, no classifications shall be made, and no minimum wage rate shall be fixed, solely on a regional basis, but the industry committee and the Administrator shall consider among other relevant factors the following: (1) competitive conditions as affected by transportation, living, and production costs; (2) the wages established for work of like or comparable character by collective labor agreements negotiated between employers and employees by representatives of their own choosing; and (3) the wages paid for work of like or comparable character by employers who voluntarily maintain *minimum* wage standards in the industry. No classification shall be made under this section on the basis of age or sex; subsection (d) of the aforecited section is amended to provide that the industry committee shall file with the Administrator a report containing its recommendations with respect to the matters referred to it. Upon the filing of such report, the Administrator, after due notice to interested persons, and giving them an opportunity to be heard, shall by order approve and carry into effect the recommendations contained in such report, if he finds that the recommendations are made in accordance with law, are supported by the evidence adduced at the hearing, and, taking into consideration the same factors as are required to be considered by the industry committee, will

carry out the purposes of this section; otherwise he shall disapprove such recommendations and he shall again refer the matter to such committee, or to another industry committee for such industry which he may appoint for such purpose, for further consideration and recommendations; subsection (e) of that section is amended thus: Order issued under this section shall define the industries and classifications therein to which they are to apply, and shall contain such terms and conditions as the Administrator finds necessary to carry out the purposes of such orders, to prevent the circumvention or evasion thereof, and to safeguard the *minimum* wage rates established therein. No such order shall take effect until after due notice is given of the issuance thereof by publication in the Federal Register and by such other means as the Administrator deems reasonably calculated to give to interested persons general notice of such issuance; subsection (f) thereof is amended to read: Due notice of any hearing provided for in this section shall be given by publication in the Federal Register and by such other means as the Administrator deems reasonably calculated to give general notice to interested persons.

Public Law No. 381 of August 12, 1955—2 U.S. Congressional and Administrative News 3082–3086, First Session 1955, 69 United States Statutes at Large 711–712—amends the following sections of the Fair Labor Standards Act of 1938: Effective July 1, 1956, subsection (a) of § 8 is amended by inserting at the end thereof the following sentence: *Minimum* rates of wages established in accordance with this section shall be reviewed by such a committee at least once each fiscal year; subsection (a) of § 5 is amended by striking out the words "and the Administrator" in the last sentence; subsection (b) of § 8 is amended by striking out the second sentence and inserting in lieu thereof the following: "The industry committee shall investigate con-

ditions in the industry and the committee, or any authorized subcommittee thereof, shall after due notice hear such witnesses and receive such evidence as may be necessary or appropriate to enable the committee to perform its duties and functions under this Act"; subsection (c) of § 8 is amended by striking out the words "and the Administrator" from the previous part immediate to the enumeration of the relevant factors; subsection (d) of § 8 is amended to read thus: The industry committee shall file with the Secretary of Labor a report containing its recommendations with respect to the matters referred to it and upon the filing of such report, the Secretary shall publish such recommendations in the Federal Register and shall provide by order that the recommendations contained in such report shall take effect upon the expiration of 15 days after the date of such publication; subsection (e) of § 8 is amended by striking out the last sentence which previously provided: No such order shall take effect until after due notice is given of the issuance thereof by publication in the Federal Register and by such other means as the Administrator deems reasonably calculated to give to interested persons general notice of such issuance.

Maybe it would be convenient to add that Public Law No. 85–231 of August 30, 1957—2 U.S. Code Congresional and Administrative News 1756–1760, First Session 1957: 71 United States Statutes at Large 514—upon redrafting the area of application of the Fair Labor Standards Act of 1938, amends § 13 of said Act by adding at the end thereof the following new subsection (1) which specifies: The provisions of §§ 6, 7, 11, and 12 shall not apply with respect to any employee whose services during the workweek are performed in a workplace within a foreign country or within territory under the jurisdiction of the United States other than the following: a State of the United States; the

District of Columbia; Alaska; Hawaii; Puerto Rico; the Virgin Islands . . . American Samoa; Guam; Wake Island; and the Canal Zone.

Public Law No. 85–750 of August 25, 1958 to amend the Fair Labor Standards Act of 1938 with respect to the *frequency* of review of *minimum* wage rates for Puerto Rico and the Virgin Islands—2 U.S. Code Congressional and Administrative News 3887–3888, Second Session 1958; 72 United States Statutes at Large 844—provides that § 8 of the Fair Labor Standards Act of 1938 is amended by striking out the last sentence of subsection (a) and inserting in lieu thereof: *Minimum* rates of wages established in accordance with this section which are not equal to the *minimum* wage rate prescribed in paragraph (1) of § 6(a) shall be reviewed by such a Committee once during each biennial period, beginning with the biennial period commencing July 1, 1958, except that the Secretary, in his discretion, may order an additional review during any such biennial period.

Public Law No. 87–30 of May 5, 1961 to amend the Fair Labor Standards Act of 1938 to provide coverage for employees of large enterprises engaged in retail trade or service and of other employers engaged in commerce or in the production of goods for commerce, to increase the minimum federal wage to $1.25 an hour, and for other purposes —2 U.S. Code Congresional and Administrative News 1620– 1715, First Session 1961, 75 U.S. Statutes at Large 67–69— amends subsection (c) of § 6 of the Federal Fair Labor Standards Act to read as follows: (c) The rate or rates provided by subsections (a) and (b) of this section shall be superseded in the case of any employee in Puerto Rico or the Virgin Islands only for so long as and insofar as such employee is covered by a wage order heretofore or hereafter issued by the Secretary pursuant to the recommendations of a special industry committee appointed pursuant to § 5: *Pro-*

*vided*, That (1) the following rates shall apply to any such employee to whom the rate or rates prescribed by subsection (a) would otherwise apply:

(A) The rate or rates applicable under the most recent wage order issued by the Secretary *prior* to the effective date of the Fair Labor Standards Amendments of 1961, increased by 15 per centum, unless such rate or rates are superseded by the rate or rates prescribed in a wage order issued by the Secretary pursuant to the recommendations of a review committee appointed. Such rate or rates shall become effective sixty days after the effective date of the Fair Labor Standards Amendments of 1961 or one year from the effective date of the most recent wage order applicable to such employee theretofore issued by the Secretary pursuant to the recommendations of a special industry committee appointed under § 5, whichever is later.

(B) Beginning two years *after* the applicable effective date under paragraph (A), not less than the rate or rates prescribed by paragraph (A), increased by an amount equal to 10 per centum of the rate or rates applicable under the most recent wage order issued by the Secretary prior to the effective date of the Fair Labor Standards Amendments of 1961, unless such rate or rates are superseded by the rate or rates prescribed in a wage order issued by the Secretary pursuant to the recommendations of a review committee appointed under paragraph (C).

(C) Any employer, or group of employers, employing a majority of the employees in an industry in Puerto Rico or the Virgin Islands, may apply to the Secretary in writing for the appointment of a review committee to recommend the minimum rate or rates to be paid such employees in lieu of the rate or rates provided by paragraph (A) or (B). Any such application with respect to any rate or rates provided for under paragraph (A) shall be filed within sixty days

following the enactment of the Fair Labor Standards Amendments of 1961 and any such application with respect to any rate or rates provided for under paragraph (B.) shall be filed not more than one hundred and twenty days and not less than sixty days prior to the effective date of the applicable rate or rates under paragraph (B). The Secretary shall promptly consider such application and may appoint a review committee if he has reasonable cause to believe, on the basis of financial and other information contained in the application, that compliance with any applicable rate or rates prescribed by paragraph (A) or (B) will substantially curtail employment in such industry. The Secretary's decision upon any such application shall be final. Any wage order issued pursuant to the recommendations of a review committee appointed under this paragraph shall take effect on the applicable effective date provided in paragraph (A) or (B).

(D) In the event a wage order has not been issued pursuant to the recommendation of a review committee prior to the applicable effective date under paragraph (A) or (B), the applicable percentage increase provided by any such paragraph shall take effect on the effective date prescribed therein, except with respect to the employees of an employer who filed an application under paragraph (C) and who files with the Secretary an undertaking with a surety or sureties satisfactory to the Secretary for payment to his employees of an amount sufficient to compensate such employees for the difference between the wages they actually receive and the wages to which they are entitled under this subsection. The Secretary shall be empowered to enforce such undertaking and any sums recovered by him shall be held in a special deposit account and shall be paid, on order of the Secretary, directly to the employee or employees affected. Any such sum not paid to an employee because of inability to do so within a period of three years shall be covered into the Treasury of the United States as miscellaneous receipts.

(2) In the case of any such employee to whom subsection (b) would otherwise apply, the Secretary shall within sixty days after the enactment of the Fair Labor Standards Amendments of 1961 appoint a special industry committee in accordance with § 5 to recommend the highest minimum wage rate or rates in accordance with the standards prescribed by § 8, not in excess of the applicable rate provided by subsection (b), to be applicable to such employee in lieu of the rate or rates prescribed by subsection (b). The rate or rates recommended by the special industry committee shall be effective with respect to such employee upon the effective date of the wage order issued pursuant to such recommendation but not before sixty days after the effective date of the Fair Labor Standards Amendments of 1961.

(3) The provisions of § 5 and § 8, relating to special industry committees, shall be applicable to review committees appointed under this subsection. The appointment of a review committee shall be in addition to and not in lieu of any special industry committee required to be appointed pursuant to the provisions of subsection (a) of § 8, except that no special industry committee shall hold any hearing within one year after a minimum wage rate or rates for such industry shall have been recommended to the Secretary by a review committee to be paid in lieu of the rate or rates provided for under paragraph (A) or (B). The minimum wage rate or rates prescribed by this subsection shall be in effect only for so long as and insofar as such minimum wage rate or rates have not been superseded by a wage order fixing a higher minimum wage rate or rates but not in excess of the applicable rate prescribed in subsection (a) or subsection (b) hereafter issued by the Secretary pursuant to the recommendation of a special industry committee.

The ambiguous trend of opinion which prevailed with respect to the possible unconstitutionality of the laws regulating the labor contract, as being contrary to the freedom

of contracting guaranteed by the Constitution of the United States, prevented most of the prior North American and Puerto Rican laws aimed at regulating labor contract from fully achieving its altruistic purposes. When the Supreme Court of the United States decided the case of *West Coast Hotel Company* v. *Parrish*, 300 U.S. 379, 391–400, 81 L.Ed. 703, 708–713 (Hughes) (1937), recognizing the right of the State to regulate the contract of work to protect the health, safety, morals and welfare of the worker, it opened the wide door which brought the Fair Labor Standards Act of 1938 of the Congress of the United States and Act No. 8 of April 5, 1941 of the Legislature of Puerto Rico, creating a Minimum Wage Board.

The picture of congruences between both statutes would show that §§ 3, 4, and 6 of Act No. 8 of Puerto Rico regarding the organization, operation and powers of our minimum wage committees are very similar to the committees for the corresponding industry of the Federal Fair Labor Standards Act. Determinations with respect to minimum wage in general, the workweek, the hourly overtime rate which would govern in the future, are assigned by the Legislature of Puerto Rico to the quasi-legislative task to be performed by the Minimum Wage Board.

However, regarding salaries earned prior to the Minimum Wage Board decrees it was necessary to resort to those laws of ours which in some manner had attempted, prior to the case of West Coast Hotel Company, to regulate the labor contract. There appeared Act No. 45 of June 9, 1919, which made unlawful for any employer of women, girls inclusive, in industrial occupations, or commercial, or public-service undertakings, to pay them wages lower than those specified in this section, to wit: minors under 18 years of age at the rate of four (4) dollars a week, and over said age at the rate of six (6) dollars a week. The first three weeks of apprenticeship shall be exempt from the provisions of

this section, the foregoing provisions shall not be applicable to agriculture and agricultural industries; also the provisions of § 553 of the Penal Code—as amended theretofore by Act No. 57 of March 13, 1913, Act No. 131 of August 9, 1913, Act No. 26 of November 23, 1917, Act No. 18 of May 20, 1925, and Act No. 54 of April 25, 1930—known as the Closing Act and which represented the first effort to create a day of rest for our employees, except when the 24th of December and January 5th fell on Sundays and the legal holidays from 12 noon and with respect to working days for establishments, to be closed from 6:00 p.m., except Saturdays, when they could close at 9:00 p.m.; another Act No. 80 of May 5, 1931 was also unearthed, to regulate "extra hours of the day or night" when, in the judgment of said Commissioner of Labor it may be necessary for the purpose of permitting said employers or owners to complete urgent or necessary works which must be finished within a determined time in shops, factories or any other industrial establishment in Puerto Rico and which for the first time establishes compensation for any overtime worked by operatives or employees of said *industrial* establishments when employers or owners have been duly authorized in accordance with the provisions of this Act, which overtime shall be paid a double rate of wages for each hour, which was amended by Act No. 24 of April 15, 1935 to include the terms "employee" and "commercial," inasmuch as Act No. 80 of 1931 referred only to "workmen," "shops," "factories," or "industrial establishment."

The law around which the fruits of violence were to ripen was Act No. 49 of August 1, 1935, to regulate the *working hours* of persons employed in commercial and industrial establishments and in other lucrative businesses, and for other purposes, which provided: "No person shall be employed or shall be permitted to work in any commercial, industrial, or agricultural establishment or in any other

lucrative business more than eight (8) hours during any natural day, except in case of some extraordinary event or emergency caused by fire, famine, or flood, or danger to life, property, or public safety or health or under any other special circumstances, provided that the Governor of Puerto Rico, on recommendation of the Commissioner of Labor, subsequently declares that the provisions of this Act shall not apply in these excepted cases and that therefore the violations committed were excusable; *Provided*, that the limit of eight (8) hours established by this section, in all normal labor aside from the exceptions already noted, may be extended to a period that shall not exceed nine (9) hours during any natural day, on condition that every person so employed for wages, by the day, or otherwise, for more than eight (8) hours during any natural day, shall be paid for the work that he does during such extra time at a rate double that of the wages being paid him by the hour for the preceding work."

The decisions of this Court regarding Act No. 49 of August 7, 1935 did not satisfy either legislators or laborers, and much less a new generation of judges of our courts of first instance who had followed closely the terrible debate on the labor contract in the North American courts. This Court concluded that inasmuch as Act No. 49 of 1935 was concerned with hours, and nothing else, overtime pay could only be at double time after the ninth hour and the rest of the hours after the ninth hour should be paid at the regular rate, using as a divisor for the rate per extra hour, not the eight legal hours, but all the hours actually worked. That is, *sub silentio*, the old theory of freedom of contract as against the regulation of the working hours by the State continued to operate. There is not time or space enough for an orderly recital of this first period of our decisions on Act No. 49 of 1935. We shall only quote as the most characteristic of this first period of our labor case law, properly

speaking, the cases of *Cardona* v. *District Court*, 62 P.R.R. 59 (Snyder) (1943), and *Avellanet* v. *Porto Rican Express Co.*, 64 P.R.R. 660 (Snyder) (1945).

This dissatisfaction with the fruits of violence produced our present Act No. 379 of May 15, 1948 to establish the working day in Puerto Rico, to provide for the payment of double time for hours worked in excess of the legal working day, to fix periods of rest, to regulate certain aspects of labor contracts, to impose certain duties on employers, to fix penalties for the violation of the provisions of this Act; to repeal Act No. 49, of August 7, 1935.

As it may be observed, the Puerto Rican Act of 1948 does not fix an hourly minimum wage rate as does the Federal Fair Labor Standards Act, but leaves such function to the Minimum Wage Board of Puerto Rico, requiring the corresponding economic study of the industry, and as to the regular wage it leaves it open to collective or individual bargaining, but it follows the same federal legislative pattern with respect to the workweek and the wage rate for overtime, keeping in both cases the historical individuality of our legislation concerning the "natural day," "48-hour workweek" and "double pay." In summary, the new Act provides:

Regarding hours it is established that eight hours of work constitute the legal working day in Puerto Rico, forty-eight hours of work constitute a working week and two hundred and eight hours of work constitute a working month; regular hours of work are eight hours during any period of twenty-four consecutive hours, forty-eight hours during any week, and two hundred and eight hours during any month; and the Commissioner of Labor shall cause to be published every year in newspapers of general circulation in the Island, a note stating the exact number of regular hours of work during each month of the year, in conformity with the

number of working days and hours according to the *calendar* and legislation in force as regards legal holidays.

Extra hours of work are (a) the hours that an employee works for his employer in excess of eight hours during any period of twenty-four consecutive hours; (b) the hours that an employee works for his employer in excess of forty-eight hours during any week; (c) the hours that an employee works for his employer during the days or hours when the establishment in which he renders services should remain closed to the public by provision of law; (d) the hours that an employee works for his employer during the day of rest heretofore or hereafter fixed by law in the case of businesses and industries not subject to the closing of their establishments; (e) the hours that an employee works for his employer in excess of such maximum working hours a day as the Minimum Wage Board may have fixed or may fix for the occupation, business, or industry in question; (f) the hours that an employee works for his employer in excess of the maximum number of working hours a day fixed in a collective labor agreement.

Regarding overtime pay the wage rate shall be double the regular rate agreed, *"Provided, however,* That every employer in any industry in Puerto Rico covered by the provisions of the Fair Labor Standards Act enacted by the Congress of the United States of America on June 25, 1938, as heretofore or hereafter amended, shall be under obligation to pay only for each hour of work in excess of the legal eight-hour working day, or in excess of forty (40) hours a week, a wage at the rate of not less than time and a half the rate of wage agreed upon for regular hours, save when by a decree of the Minimum Wage Board or by a collective labor agreement, other working and/or compensation standard is heretofore or hereafter fixed. To determine the wage rate agreed upon for regular hours of work, the daily, weekly, or monthly wages, or wages otherwise stipulated, shall be

divided by the number of regular hours worked during that same period in accordance with the provisions of this Act."

Regarding what is understood to be covered by the payment of wages, if an employee works for a weekly wage, the wage stipulated shall cover solely the payment of the regular working hours during each week; the same holds if an employee works for a monthly wage, the wage stipulated shall cover solely the payment of the regular working hours during each month; if the contract is on the basis of piecework or any other unit of work, the employee shall be entitled to receive double compensation for the pieces or units made during extra hours.

With these two Acts the Legislature of Puerto Rico and this Court were able, by applying the principle of coexistence of federal and local statutes, elaborated during the politico-judiciary relations of Puerto Rico and the United States, to reach 1956 without any difficulty. As a matter of fact, pursuant to subsection (e) of § 5 of the Federal Fair Labor Standards Act, pursuant to the addition made to the original Act by the Joint Resolution of June 26, 1940, in the sense that no industry committee organized to fix salaries in the United States shall have any power to extend said minimum wage rates to any employee in Puerto Rico or in the Virgin Islands and authorizing the Federal Wage and Hour Administrator to appoint a special industry committee to recommend the minimum wage rates and pursuant to the *Provided* clause of § 5 of the Act to Establish the Working Day in Puerto Rico, in the sense that every employer in any industry in Puerto Rico covered by the provisions of the Federal Fair Labor Standards Act shall be under obligation to pay only for each hour of work in excess of the legal eight-hour working day, or in excess of forty (40) hours a week, a wage at the rate of not less than time and a half the rate of wage agreed upon for regular hours, prevented any conflict between both statutes which could force

us to pass upon the purpose of the Congress of the United States of establishing a Congressional preeminence over any legislation of the Legislature of Puerto Rico. We should not forget that the Federal Fair Labor Standards Act, outside of fixing a basic minimum wage rate, defining what constitutes a maximum workweek and fixing a minimum rate of pay for working hours, does not contemplate any purpose of setting aside the state legislations on labor contracting.

Nevertheless, there are certain pressure groups who, without measuring the interest of the United States and Puerto Rico governments as to maintaining in a more reasonable socio-economic medium those labor conditions which help the most to the moral, well-being and health of the worker groups concerned, without substantially curtailing employment, and who suspecting that the industrialization plan of the Government of Puerto Rico with its incentives of tax exemption, industrial buildings, and financial aid may create unfair competition to American industries operating in the Continent, seek to make applicable to Puerto Rico the federal legislative minimum established for the industries which they operate in the United States.

The fruit of this violence are the laws of the Congress of the United States—Public Law No. 381 of August 12, 1955, Public Law No. 85–231 of August 30, 1957, Public Law No. 85–750 of August 25, 1958, and Public Law No. 87–30 of May 5, 1961, aforecited—seeking to bring to the same level the minimum basic wage rates of United States and Puerto Rico, without taking into consideration the particular conditions of our economy and taking the risk of the substantial reduction in employment, generally brought about by such measure. The response of the Legislature of Puerto Rico, trying to consolidate the state of law most beneficial to our economy created by § 5 of the Federal Fair Labor Standards Act and § 5 of the Act to Establish the Working Hours in Puerto Rico, is found in Act No. 96 of June 26,

1956, Act No. 103 of June 25, 1958, and Act No. 81 of June 14, 1960.

The declaration of policy of Act No. 96 of June 26, 1956 is dispersed throughout different parts of the statute and it is advisable to detail the principles which better show the legislative purpose: Section 1 of the Act provides (a) The Legislature of Puerto Rico hereby finds that the existence of substandard wages, hours of work and other working conditions in industry is detrimental to the health, efficiency and general well-being of workers; is detrimental to the sound and full development of economy; constitutes an unfair method of competition in production and trade; leads to disputes between workers and employers which obstruct the progressive development of the Puerto Rican economy; and represents a state of manifest social injustice; (b) it is hereby declared to be the policy of the Commonwealth of Puerto Rico as rapidly as possible to eliminate substandard working conditions in industries; promote living, health and safety standards for workers; step up the development of agriculture, industry and businesses in Puerto Rico; eliminate unfair competition, and achieve the highest possible wage level compatible with such development, without substantially curtailing employment or impairing the opportunities to obtain the highest wages; (c) it is hereby further declared to be the policy of this Act to maintain the necessary flexibility in the fixing of minimum wages so as to insure for the workers the highest wage that the economic conditions of the industry will permit; and that the minimum wages in each business, industry or occupation be revised at least once every two years until attaining, as rapidly as is economically possible, a minimum wage of $1.00 per hour in all industries; (d) it is hereby further declared to be the policy of this Act that the *minimum wage level* for workers employed in industries producing or shipping their products *for sale in the United States* in competition with industries located there,

should, so far as possible, equal or approximate the minimum wages provided by this Act for workers in the respective competitive industries; (e) it is hereby further declared to be the policy of the Legislature of Puerto Rico to encourage collective bargaining between laborers and employers which will serve as an effective social instrument progressively to raise the level of minimum wages, reduce the working day, and insure those other working conditions requisite to the health and welfare of workers; (f) it is hereby likewise declared to be the policy of the Legislature of Puerto Rico that the Minimum Wage Board, in discharging the duties assigned to it in this Act, shall establish, as rapidly as possible, equal minimum wages for laborers doing similar work in enterprises producing exclusively for the local market and enterprises shipping their products for sale outside of Puerto Rico; (g) it is hereby likewise declared to be the policy of the Legislature of Puerto Rico that the proceedings authorized by this Act for the fixing and revision of minimum wages be conducted in a quasi-legislative manner.

Section 2 creates in the Department of Labor a Minimum Wage Board composed of three persons known to be in accord with the purposes of this Act, who shall be appointed by the Governor of Puerto Rico with the advice and consent of the Senate, for a term of four years. The Governor shall designate one of said persons Chairman of the Board, who, under the supervision of the Secretary of Labor, shall be the executive and administrative head of the Board, and all matters of a purely administrative nature shall be disposed of by him. Two members of the Board shall constitute a quorum and, in case of absence or illness, the Chairman may designate any of the other two members of the Board to substitute for him. The Board shall have authority to issue regulations and to exercise all other powers necessary to accomplish the purposes of this Act.

Sections 3 and 4 establish as duties and powers of the Board the following: (1) to study the labor conditions which prevail in the different industries in Puerto Rico; (2) request from all departments, agencies, corporations, authorities, offices and political subdivisions of the Commonwealth of Puerto Rico to furnish the Board, free of charge, expense, or fee, all the official information, books, pamphlets, or publications, certified copies of documents, statistics, compilations of data and statements required therefrom for official use of the Board; (3) the Chairman or any member of the Board may issue subpoenas and compel the appearance of witnesses and the production of data or information that the Board or the Chairman may deem necessary, including payrolls, records of wages and hours of work, pay lists, assets and liabilities statements, profit and loss statements, and accounting books; (4) the Chairman, or any member of the Board thereof may administer oaths and receive testimony, data or information; (5) if a summons issued by the Chairman or any other member of the Board is not duly complied with, the said Board may petition any section of the Superior Court of Puerto Rico for an order directing compliance with said summons, and the Superior Court shall have power to punish noncompliance with such orders as a contempt of court; (6) any natural person may be prosecuted and punished for perjury committed while testifying before the Board or its Chairman, or before a Minimum Wage Committee.

Section 6 is the first attempt of the Legislature of Puerto Rico, subsequent to 1919, to fix by legislation a minimum hourly wage, as of June 26, 1956, for industries covered by said section, and § 7 decrees an increase of 25% in the minimum wage and "(a) for all work or service not covered by the provisions of section 6 of this act, every employer shall pay a wage not lower than 25% above the minimum wage he was obliged to pay on January 1, 1956

by federal wage order provision. But if after January 1, 1955 there was fixed for said work or service, by federal wage order provision, a minimum wage increase which did not reach up to 25% of said minimum wage, there shall be paid a wage not lower than 25% above the minimum wage in force immediately before such increase. In no case shall the minimum wage thus increased exceed one (1) dollar per hour for any work or service, and (b) for all work or service covered by mandatory decree, every employer shall pay a wage not lower than 25% above the minimum wage he was obliged to pay on January 1, 1956. But if after January 1, 1955 there was fixed for said work or service a minimum wage increase which did not reach up to 25% of said minimum wage, there shall be paid a wage not lower than 25% above the minimum wage in force immediately before such increase. In no case shall the minimum wage thus increased exceed one (1) dollar per hour for any work or service." Pursuant to subsection (d) of § 7, the following industries and activities shall not be subject to the 25% increase provided therein: (1) agriculture in all its branches; (2) tobacco stemming; (3) handmade homework of the needlework industry; (4) any work or service which by federal wage order has had a wage increase of 25% or over after January 1, 1955; (5) any work or service which by mandatory decree has had a wage increase of 25% or over after January 1, 1955; (6) railroad passenger and freight transportation industry.

Regarding the increases provided in subsections (a) and (b) of § 7, they shall take effect sixty days after the approval of the Act, and subsection (e) thereof provides that: Any industry which shall deem itself unable to pay the increase applicable thereto shall submit to the Minimum Wage Board of Puerto Rico, not later than thirty (30) days after the taking effect of this act, a petition under oath setting forth in detail the financial condition of the industry and

the economic reasons why it considers itself unable to pay same. The said petition shall be considered by the Board if timely filed and if signed by employers who jointly employ in Puerto Rico not less than one-third of the total labor force used in the industry, and pursuant to subsection (h) therein in the exercise of its quasi-legislative functions, the Board, after studying the petition and the industry, shall as soon as practicable issue an order determining whether the industry shall pay the 25% increase or an increase lower or higher than 25%, or whether it shall pay no increase at all, and fixing the minimum wage which the employers of said industry shall pay their employees according to the said order and finding of the Board.

With respect to the minimum wage for new manufacturing industries, § 8 provides that (a) every employer in a manufacturing industry established in Puerto Rico after July 1, 1956 for the production of goods which on that date were not being produced in Puerto Rico on a commercial scale, shall pay to his employees a wage not lower than $0.50 per hour; (b) every employer in a manufacturing industry established in Puerto Rico after July 1, 1957 for the production of goods which on that date were not being produced in Puerto Rico on a commercial scale shall pay to his employees a wage not lower than $0.60 per hour; the provisions of subdivisions (a) and (b) of this section shall not apply to employers in a manufacturing industry established in Puerto Rico for the production of goods using mainly farm products grown in Puerto Rico as raw material or the wastes or by-products from other industrial processing of such farm products, providing also in § 8 that nothing contained in this section shall be understood to limit the power of the Board to fix minimum wages, not exceeding $1.00 per hour, for any industry which, upon starting operations, has been included within the provisions of this section.

Section 10 authorizes the fixing or revision of minimum wages by minimum wage committees appointed by the Chairman of the Board, composed of an equal number of persons representing the public interest, the employers, and the employees of the industry concerned and in case the Committee so appointed is composed of an even number of members, the Chairman of the Board shall, furthermore, designate to form a part of the Committee an additional member representing the public interest, who may participate in the hearings just like any other member of the Committee, but the additional member shall attend and participate in the deliberations, decisions and voting of the Committee only when the Committee is unable to recommend a draft decree due to a tie vote and his presence and intervention is summoned by at least one-half of the members integrating the Committee, and (b) in the case of industries covered by the Fair Labor Standards Act of 1938, as amended, the Chairman may designate as members of a minimum wage committee residents of any State of the United States or of the District of Columbia, and whenever the Chairman decides to appoint such members, he shall designate a number of representatives of the public interest, of the employers and of the employees of the industry concerned equal to the number of members designated from Puerto Rico for each such representation, and to break the tie an additional member shall be designated, representing the public interest, to form part of said Committee with the same functions and powers of the additional member representing the public interest created by subsection (a).

Section 11 establishes that whenever the Minimum Wage Board determines that proceedings must be instituted to fix or revise minimum wages for an industry, it shall issue a call for a public hearing before the pertinent Minimum Wage Committee and in the exercise of its quasi-legislative functions, the Committee shall conduct the hearing in the

fashion of a public consultation (as it would be conducted by a legislative committee or commission) so that all interested persons may participate in the working out of a decree by submitting pertinent data, information, remarks or arguments, which may, in the discretion of the Committee, be presented either written or orally.

Section 12 requires that the corresponding Minimum Wage Committee shall transmit to the Board the complete record of the hearing together with a report embodying its findings of fact and a draft decree recommending the minimum wage rate or rates to be paid in the industry concerned, none of which shall exceed $1.00 per hour; § 13 provides that the draft-decree recommended by the committee shall be published for the filing of objections and suggestions by interested persons and the power of the Minimum Wage Board to accept or reject the draft decree recommended, and it may remand same to the committee, should the Board conclude that the decree is not acceptable, for reconsideration of same, or by appointing a new committee for a new determination of wages, providing in the same § 13 that the decree approved by the Minimum Wage Board shall have the force of law and shall become effective fifteen (15) days after publication by the Board of a notice in a newspaper of general circulation in Puerto Rico informing the public of its approval, and in the case of an industry covered by the Federal Fair Labor Standards Act of 1938, as amended, the Chairman of the Board shall send a copy of the approved decree to the Secretary of Labor of the United States.

It remains only to clearly set forth the provisions of § 15 which establish the following minimum wages standards: (a) "The minimum wages for each industry shall be fixed with due regard to the ends and purposes of this act. They shall be the highest minimum wages that can reasonably be paid by the industry concerned without substantially curtailing employment in such industry and taking into consideration

the cost of living and the needs of the employees as well as the economic and competitive condition of the industry in question," and "(b) in the case of manufacturing industries covered by the Federal Fair Labor Standards Act of 1938, as amended, and which are in substantial competition with industries of the States of the Union, consideration shall also be given to the prevailing wages in the latter and the competitive situation existing between industries of Puerto Rico and similar industries of the United States," and the provisions of § 17 which establish: "The Board shall revise the minimum wages fixed by this act or by decrees or orders of the Board, with respect to each industry, at least once every two years. In no case shall the minimum wage fixed by the Board exceed $1.00 per hour or be lower than the corresponding minimum wage fixed by this act." Section 29 of the Act contains a complete system of judicial review in favor of any person aggrieved by any mandatory decree or order issued by virtue of §§ 7 and 20 of this Act in those cases in which the corresponding Minimum Wage Committee acted without authority or ultra vires.

The picture of congruences between the Fair Labor Standards Act of 1938 of the Congress of the United States of America and Act No. 96 of June 26, 1956, previously and immediately quoted, is still closer than any previous picture of congruence between the first federal law and Act No. 8 of April 5, 1941 creating our first Minimum Wage Board, as amended by Act No. 44 of April 23, 1942 or Act No. 379 of May 15, 1948, establishing the working day in Puerto Rico. Compare § 2 of the Fair Labor Standards Act with § 1 of Act No. 96 of June 26, 1956 regarding the statement of motives or the declaration of policy; the definitions of the words "person" and "employer" of § 3 of the federal Act with the definition of "employer" of § 26 of the insular Act; the definition of "agriculture" of § 3 (f) of the federal Act with the definition of "agriculture" of § 36 of the insu-

lar Act; the definition of "industry" of § 3(h) of the Federal Act with the definition of "industry" of § 36 of the insular Act; the definition of "goods" of § 3(i) of the federal Act with the definition of "manufacturing industry" of § 36 of the insular Act; the definition of "wage" of § 3(a) of the federal Act with the definition of "wage" of § 36 of the insular Act; the creation of the office of "administrator" of § 4 of the federal Act with the creation of the Minimum Wage Board of § 2 of the insular Act; the creation of the special committees for the industries of Puerto Rico and the Virgin Islands of § 5 of the federal Act with the creation of the minimum wage committees for the industries of Puerto Rico covered by the Fair Labor Standards Act of 1938 of § 10(b) of the insular Act; the fixing of minimum wage of § 6 of the federal Act with the fixing of the minimum hourly wage of § 6 of the insular Act; the fixing of the maximum hours of work of § 7 of the federal Act with the fixing of regular hours of work of § 3 of Act No. 379 of May 15, 1948 of Puerto Rico; the provision for the wage orders for Puerto Rico and the Virgin Islands of § 8 of the federal Act with the provision on special minimum wage committees of § 10(b) of the insular Act; the power to summon witnesses of § 9 of the federal Act with the investigative power of § 4(a) of the insular Act; the provisions of § 10 of the federal Act for review by the courts with the provisions on judicial review of § 29 of the insular Act; the procedure to be followed regarding investigations, inspection, the obtaining of documentary evidence and regulations of homework of § 11 of the federal Act with the duties of employers provided by § 5 of the insular Act; the exemptions of executives, administrators and professionals of § 13(a) of the federal Act with the corresponding exemption established under the word "employee" of § 19 of Act No. 379 of 1948; the regulation for apprentices, students and disabled persons of § 14 of the federal Act with the similar provisions of §§ 22 and

23 of the insular Act; the discrimination prohibited by § 15 of the federal Act with the discrimination by employers prohibited by § 24 of the insular Act; the penalties imposed by § 16 of the federal Act with those imposed by §§ 25 and 27 of the insular Act; the injunction proceeding provided by § 17 of the federal Act with the injunction and other proceedings provided by § 28 of the local Act; the applicability of other more beneficial laws established by § 18 of the federal Act with the saving clause with identical purpose of § 40 (c) of the local Act; the separability of clauses authorized by § 19 of the federal Act with the provisions on separable clauses of § 42 of the insular Act.

As it may be seen, from a joint examination of both statutes there emerges a situation of coexistence of statutes regarding the same matter and the application of one of the statutes with preference to the other depends on which of the two is more beneficial to the laborer, according to the state of law created by the case of *People* v. *Shell*, 302 U.S. 253, 261, 264, 82 L.Ed. 235, 242, 244; § 18 of the Fair Labor Standards Act of 1938 of the Congress of the United States, and our own case law, as set forth in this very opinion. There is nothing in the legislative history of Act No. 96 of June 26, 1956 of Puerto Rico—which militates against this conclusion.

In the legislative debate centered on Act No. 96, it is easy to discover that the legislative ideal leading to the approval of Act No. 96 of June 26, 1956 is (1) to keep the particularity of the case of Puerto Rico on the federal imposition of a uniform minimum wage for all American areas, our own Legislature establishing such minimum wage rates as would protect our economy and at the same time reduce to the minimum any disadvantage in competition that such difference in minimum wage rates could bring about; (2) to keep the most beneficial rule for the laborer in all the other labor conditions, other than the minimum wage;

for all the industries covered by the Federal Fair Labor Standards Act, under the authority of § 18 of said Fair Labor Standards Act.

Regarding the first point, it was elucidated during the close debate that, for some industries, the determinations made by the federal wage committees in the investigation and fixing of minimum wages for industries covered by the Federal Fair Labor Standards Act established in Puerto Rico were adopted by our legislative mandate as *local law* and in other industries the determinations that could be adopted as our *local law* could be those made by the Minimum Wage Committees of our own Minimum Wage Board for other industries established in Puerto Rico also covered by the Federal Fair Labor Standards Act, protected by the unshakable policy of the Fair Labor Standards Act not to take action, contrariwise, when the federal imposition could curtail employment or increase any disadvantage in the free movement of goods for commerce between Puerto Rico and the United States. As it is known, Puerto Rico is a country with a shortage of raw material and the double freight cost could cause unfair competition.

During the legislative discussion the floor leader of the government party, Mr. Víctor Gutiérrez Franqui, clearly revealed the interest of the Puerto Rican state in keeping the preeminence and the applicability of the *local law* in every question of wages, following the method adopted in the drafting of the *Provided* clause of § 5 of Act No. 379 of May 15, 1948. Let us see. From Tome III, Volume 8 of the Journal of Proceedings of the Legislature of Puerto Rico corresponding to the Regular Session for 1956, we extract the following:

"Mr. Gutiérrez Franqui: As our colleague shall see in the report, this subsection of § 6 we are amending, as explained in the report, aims to make the *law of Puerto Rico* the determinations made by federal wage committees in the investigation and

fixing of minimum wages for industries in interstate commerce covered by the Fair Labor Standards Act, which determinations are approved subsequent to the last amendment made at the end of last year to the Fair Labor Standards Act by the Congress of the United States and the rates stated therein." (Section 6 of Act No. 96 of June 26, 1956.) "Are exactly the same ones fixed recently, that is, in investigations made two and three months ago by these federal committees. The reason for the amendment ensues from the fact that, subsequent to the study and the initial determinations, made by the Joint Committee on these inclusions, new federal committees convened, made new classifications and subdivisions of the industries already existing, creating these new divisions with these new wage rates, and the amendment we now propose is to add, in order to bring this section up-to-date, what has been done subsequent to the day on which this bill was drafted.

"Mr. Susoni: Are the committees empowered to review those salaries in the same manner as the rest of the rates established by this Act?

"Mr. Gutiérrez Franqui: That is so." Page 1098. (Italics ours.)

In answer to a petition of one of the minority parties— State Republican Party—for delivery of any documents the Joint Committee of the Senate and the House of Representatives of Puerto Rico might have on which the federal wage committees might have worked, the floor leader for the government party informed:

"Mr. Gutiérrez Franqui: First, we want to state that, as far as we know, the Joint Committee does not have the complete record, what we may call the complete record of these federal industry committees which include the transcript of the testimonies presented before the committee, before the federal committees and, as we explained when we proposed this amendment, the Joint Committee, upon making its recommendations on the particular we did not say it had made a study of the complete records, but we made it clear that these amendments, as the rest of the section of the Act where they are included, is a mere repetition of the minimum wage rates fixed by recent (federal) wage committees, that is, that they worked subsequent

to the amendment made last August to the Federal Fair Labor Standards Act and that the Joint Committee did not make any study to make determinations regarding these rates but merely took the rates fixed by those industrial committees to convert them into *local law,* the Commission being of the opinion that this study had been the object of recent investigation and that there was no justification for the Commission itself to make a review within two or three months subsequent to the work of these industrial committees, and that the Joint Committee accepted these rates, as fixed, for the purpose of converting them into *local law,* that is, to make them govern in Puerto Rico, irrespective of whether the work of these committees was valid or not." (Page 1148—*in fine*—1149.) (Italics ours.)

In the face of an amendment to eliminate from the bill under discussion the provision which established: "In the case of manufacturing industries covered by the Federal Fair Labor Standards Act of 1938, as amended, and which are in substantial competition with industries of the States of the Union, consideration shall also be given to the prevailing wages in the latter and the competitive situation existing between industries of Puerto Rico and similar industries of the United States." See the exact reproduction of said standard in § 15(b) of Act No. 96 of June 26, 1956, substituting it for the amendment proposed by Dr. Gilberto Concepción de Gracia, floor leader of the minority Independent Party, in the sense that: "In the case of manufacturing industries covered by the Fair Labor Standards Act of 1938, as amended, the wage to be fixed shall be at least equal to that fixed by federal legislation for the same work, for an industry of the same nature in the United States," the floor leader for the government party, Mr. Víctor Gutiérrez Franqui, succeeds in defeating the amendment by substitution, alleging: "Mr. Chairman, we have to oppose that amendment. That amendment destroys all that organization of the fixing of wage. What we must now do is to request that the federal Act be made extensive to Puerto Rico. That is the

result, every time a committee met it would have to fix the dollar to every industry in interstate commerce. That is the same as if the federal Act were made applicable to Puerto Rico as of today. We would not have to do anything like this. We move that the amendment be defeated." (Page 1212.)

The elaborate paper we have prepared was meant to demonstrate the serene and discreet patriotism, together with the scrupulous loyalty displayed at all times to keep in its best position of reasonableness, justice and reciprocity our labor contract, in those aspects which only affect our "minor economy" as well as in those which could affect our "free market" with the United States. Thanks to this patriotism and to this loyalty we have been able so far to avoid in our labor-management system, the uncertainty regarding wages imposed from outside without relation to our economic reality and without any assurance with respect to reduction in employment, the continuous change in the minimum wage rates obtained by a union organization operating within a civilization which could be more prodigal, since it possesses a consumer of higher purchasing power; we have been able to avoid, besides, any fringe benefits which could bring about unfair competition between the products manufactured in Puerto Rico and those manufactured in the United States.

The extensive inclusion we make of the Fair Labor Standards Act of 1938 and of Act No. 96 of June 26, 1956, with its corresponding table of congruences is to put an end to the myth that we are dealing with antithetical laws, devoid of possible coexistence within the same legislative ambit, one of which is more favorable than the other to the laborer or the employer, with an irreconcilable conflict which needs the straightjacket of congressional preeminence. With a view to a joint study of both statutes it is not difficult to conclude that with our Act No. 96 of June 26, 1956 we looked for and found a correspondence with the federal statute which permits the application in its entirety of our local law to any

labor contract negotiated in our country, either to govern within our own perimeter or to govern in the more vast area of our interstate operations.

Pursuant to § 3 of Act No. 379 of May 15, 1948, related to § 1 of our Act No. 289 of April 9, 1946 fixing a day of rest for every six days of work, the "workweek" provided by our local law consists of forty-eight hours, composed of six consecutive days of eight hours each $(6 \times 8 = 48)$, followed by a day of rest of twenty-four consecutive hours, which completes the traditional unit of seven days of the Puerto Rican week of all times. It must be a 6-day term because the maximum of eight hours a day compels to an extension of six days to complete the forty-eight hours a week. It must be a term of twenty-four consecutive hours because the Act refers to "a day of rest." The hours in excess of forty-eight hours a week or of eight hours in any day or of any hour within the seventh day of rest shall be paid at double the regular rate agreed. As long as it does not exceed eight hours daily, it does not matter when the period of time covered by the eight hours within the twenty-four consecutive hours which make up the working day or the day of rest, starts and ends. As a question of historical reality, the 8-hour working day is the propeller which moves the labor contracting reform in Puerto Rico.

The only exception is that consecrated by the *proviso* of § 5 of our Act No. 379 of May 15, 1948, which adopts for the industries engaged in the production of goods for interstate commerce the federal week of forty hours, but maintaining the maximum of eight hours daily. The maximum of eight hours imposes an extension of five days to reach the forty hours of the federal week. This increases the rest period to forty-eight consecutive hours after the workweek. The hours in excess of forty a week, or of eight in any day or any hour within the sixth day shall be paid at time and

a half of the regular rate, and any hour within the seventh day shall be paid at double the regular rate. As long as it does not exceed eight hours daily, it does not matter when the period covered by the eight hours during the twenty-four consecutive hours which make up the working day or the day of rest, starts and ends.

The following chart is supposed to represent the movement of the workweek during the limit allowed by the federal regulation:

| Workweek: | S | M | T | W | T | F | S | Hours worked |
|-----------|---|---|---|---|---|---|---|--------------|
| (1) | x | x | x | x | x | x | o | 48 |
| (2) | o | x | x | x | x | x | x | 48 |
| (3) | o | o | x | x | x | x | x | 40 |
| (4) | x | o | o | x | x | x | x | 40 |
| (5) | x | x | o | o | x | x | x | 40 |
| (6) | x | x | x | o | o | x | x | 40 |
| (7) | x | x | x | x | o | o | x | 40 |
| (8) | x | x | x | x | x | o | o | 40 |
| (9) | x | x | x | x | x | x | o | 48 |
| (10) | o | x | x | x | x | x | x | 48 |

According to the movement of this "workweek" respondent Caribbean Refining Co. paid only the 8 hours of the sixth day at time and a half when the sixth day fell within the fixed week established by the employer, that is, four times in a period of ten weeks. During the other weeks, even though they worked eight hours daily during six consecutive days, the sixth day was compensated at the regular rate because the six days worked appeared successively, but in two different weeks.

We only have to take a look at the results shown in this chart, without being impressed by the wretched evasive structure of the two weeks, to realize that, on top of what the provided clause of § 5 of our Act No. 379 of May 15, 1948

establishes regarding the 40-hour workweek, composed of five days of eight hours each, the respondent creates our regular 48-hour workweek, six consecutive days of eight hours each and is only willing to compensate at time and a half the hours worked during the sixth day when the six days fall within the fixed week that is established. This is contrary to the provisions of § 778.2(c) which provides that an employee's workweek is a fixed period which need not coincide with the calendar week and may begin on any day and at any hour of the day and of subsection (d) therein which does not permit averaging of hours over two or more weeks. Using the words of the San Juan trial court: The workweek established by respondent is in some aspects in accordance with the workweek provided by Act No. 379 of May 15, 1948, but, upon combining the shift schedule of six consecutive working days with two days of rest, in a fixed 7-day week, from Sunday to Sunday, the inevitable outcome of such work program is a violation to the purpose of the labor health plan contemplated by Act No. 289 of April 9, 1946, creating the day of rest. On the other hand, the six consecutive days fall only twice within the workweek. In its practical application and regarding the limitations imposed by Act No. 379 of May 15, 1948, the workweek created by the respondent-appellant consists of six days of eight hours each (48 hours) and not of five days of eight hours (40 hours), which week of 40 hours is the one authorized by the Fair Labor Standards Act and the *proviso* of § 5 of Act No. 379 of May 15, 1948. So far, the correct interpretation of the Superior Court of Puerto Rico, San Juan Part.

Respondent's proposal is, moreover, contrary to our interpretation in the case of *Compañía Popular* v. *Unión de Empleados,* 69 P.R.R. 167, 182–184 (Snyder) (1948), regarding the application of Act No. 289 of April 9, 1946, in which it was decided that: "When the continuity of work

was broken, the remaining days worked would, for purposes of calculating the six days' work, spill over into the next work-week, with possibly disastrous results for both parties. To avoid double pay under § 4, the employer would be forced to grant, and the employee would be forced to take, a day of rest in the middle of the succeeding normal work-week. Such a chaotic result should be reached only if it is compelled by the statute.

"On the other hand, if Act No. 289 is construed to mean that seven days are treated as a work-week, *separately* and as a *unit* for each employee, the parties will understand their respective rights and duties at the end of each seven-day period and the primary purpose of the statute—a day of rest in every seven days—will be achieved. To chop off every seven days in this way and to determine the respective rights and liabilities of employees and employers at that point, is similar to the method of annual calculation of income for tax purposes despite the fact that frequently income is not earned on an automatically annual basis. . . .

"Taking every seven days as the unit of measurement, it is obvious that, beginning with the first day after the employee receives his regular day of rest, he must work six consecutive days [five days if it is an interstate industry covered by the provided clause of § 5 of Act No. 379 of May 15, 1948] in order to be entitled to rest on the seventh day [sixth and seventh if it is an interstate industry]. And failure to work some day in the middle of the week does not, for purposes of receiving a day of rest without pay, begin a new period of six consecutive days of work. To so hold would be to precipitate the very chaos that our ruling herein seeks to avoid, with the employee forced to rest on a day on which both employer and employee desired him to work. There must be some fixed, regular day of rest [or two days]; and the six [or five] consecutive days of work are counted beginning the day after that date, no matter what other days

of work during the work-week have been missed for reasons unrelated to the requirement of a day of rest. . . .

"Our conclusion is that the district court committed the third and fourth errors in holding that the six days worked need not be consecutive. We hold that, taking *the regular work-week of each employee as a separate unit*, he must work on six [or five] consecutive days to be entitled to the seventh day of rest [or sixth and seventh]." (Italics ours.)

The importance of the opinion rendered in the case of *Compañía Popular* v. *Unión de Empleados* is that it presents a picture of facts very similar to this case, to wit, (1) an attempt to split the week in two in order to avoid the applicability of the day of rest following six consecutive working days; (2) an attempt to break the shift of the six consecutive days of the laborer making him appear in different weeks; (3) interruption in the shift of six consecutive days establishing a free day in the middle of the week. The solution of the case has some assumptions similar to the basic rules of the federal regulation, namely, (1) each workweek constitutes a unit, completely separated from the others, (2) the day of rest shall be granted in relation to the employee's work, regardless of the enterprise's plan, (3) averaging of hours over two or more weeks is prohibited, (4) the successive 6-day term may not be broken even if some other days have not been worked during the week for reasons other than the requirement of the day of rest; (5) the beginning of the workweek of an employee shall remain fixed, irrespective of his work program and the day of rest shall be regular and fixed within the "workweek." Regarding the adoption of the federal 40-hour workweek by the *proviso* of § 5 of Act No. 379 of May 15, 1948, we would only have to refer to the preceding citation from the case of *Peña* v. *Eastern Sugar Associates, supra* at p. 273 of this volume.

Thus, it being evident that the application of the federal regulation we have examined is less beneficial than the provi-

sions concerning the workweek of our Acts—Act No. 379 of May 15, 1948 and Act No. 289 of April 9, 1946—and our case law already analyzed, the *proviso* of § 5 of Act No. 379 of May 15, 1948 and § 1 of Act No. 289 of April 9, 1946 as construed by this Court, should be applied, and not the federal regulation. The allegation that said federal regulation governs in Puerto Rico over all our local laws more beneficial to the laborer is groundless.

Before ending we wish to make some comments on our decision in the case of *Porto. Rico Coal Company* v. *Superior Court*, 91 P.R.R. 84 (Belaval) (1964). This case in no way alters our previous decisions on the *Provided* clause of § 5 of Act No. 379 of May 15, 1948. It suffices to examine the first part of the opinion, referring to the period from January 1, 1950 to June 26, 1956, and the manner it is decided by applying the *proviso* of § 5 regarding time and a half pay for any overtime, to realize that our opinion on the matter has not changed in the least.

Now, with respect to the second part of the opinion, referring to the period from June 26, 1956, when our Act No. 96 of June 26, 1956 became effective, to August 31, 1961, a different situation is met which presents a threefold specialty: (1) The industry in question, regarding hours, has never been regulated by the Federal Fair Labor Standards Act, (2) the industry in question, regarding wages, has already been regulated by the Legislature of Puerto Rico, (3) it is a claim which, regarding other labor conditions—regular or overtime hours, overtime pay—is not based on a collective agreement.

(1) When the Fair Labor Standards Act of 1938—52 Stat. at Large 1060, 1067—was approved, seamen were exempt from the provisions of said Act, those referring to minimum wage (§ 6, 29 U.S.C.A. § 206) and as well as those referring to working hours and hourly compensation (§ 7, 29 U.S.C.A. § 207). When the 1949 amendments were

approved, the only change made was in the number within the section corresponding to the exemption: 63 Stat. at Large 910, 918. When the 1961 amendments were approved—Public Law No. 87–30 of May 5, 1961: 75 Stat. at Large 65, 71, 73—by virtue of the amendment of § 9(a)(14) of said Act to § 13 of the Fair Labor Standards Act, it is provided that the provisions of § 6 (wages) and § 7 (overtime pay) of the Fair Labor Standards Act of 1938 shall not apply with respect to any person employed as a seaman on a vessel other than an American vessel and by virtue of the amendment to § 9(b)(6) of Public Law No. 87–30 of the same § 13 of the Fair Labor Standards Act, it is established that the provisions of § 7 (hours and overtime pay) shall not apply with respect to any person employed as a seaman, regardless of the vessel. The provision ordering that minimum wage be paid to persons employed as seamen in an American vessel is included in § 5(b)(2) of the same Act No. 87–30 as an amendment by addition to subsection (b) of § 6 of the Fair Labor Standards Act (75 Stat. at Large 67). As it may be noted by this simple incidental citation of the legislative history prior to 1961, all seamen were exempt by the Fair Labor Standards Act of 1938, from the provisions of hours as well as of wages of said Act. After 1961, seamen on foreign vessels continued to be wholly exempt from the federal hour and wages provisions but seamen on American vessels continued to be exempt from the federal provisions on maximum working hours and overtime pay. The reason behind this federal exclusion is obvious: in the absence of a typical maritime contract, as was in the case, the regular maritime work contract had to be considered as a contract without fixed hours, and in the absence of proof to the contrary, it is reasonable to assume that the distances which mediate in the performance of the work do not allow for periodicity in the task. Not any express pact on the matter having been proved, there was a vacuum to be filled with

what might appear to be the best law applicable to a non-continuous task.

(2–3) Regarding the full applicability of the *Provided* clause of § 5 of Act No. 379, we already know that when there exists a mandatory decree or a collective agreement fixing other labor (hours) or compensation (wages) standards, or both (hours and wages), the *proviso* of § 5 itself of Act No. 379 establishes its own inapplicability. Regarding such full applicability of the *proviso* of § 5, we hesitate to apply our case law concerning exemptions, in the sense that dealing with specific tasks, special employees or skills expressly exempted from the Federal Fair Labor Standards Act, the *proviso* of § 5 of our Act No. 379 of May 15, 1948 is applicable because, as we have seen, by virtue of § 9 (b) and its corresponding subsection 9 (b) (6) of Public Law No. 87–30 of May 5, 1961, amending § 13 of the Federal Fair Labor Standards Act concerning the exemptions, everything related to the federal § 7 (hours and overtime pay) shall not apply "if such employee is employed as a seaman on an American vessel." It is convenient, besides, to add that the only provisions regarding compensation for seamen so employed is made as an inclusion in a special subsection established for that purpose within § 5 (b) (2) of the same Public Law No. 87–30 amending subsection (b) of § 6 of the Fair Labor Standards Act, 75 U.S. Stat. at Large 67, referring to wages—see how it now appears in § 6 (b) (2), 29 U.S.C.A. § 206 (1965 ed.); see also Changes in Exemptions, 2 U.S. Code Congressional and Administrative News 1651, 1652, 87th Congress, First Session (1961).

As it is known, both the mandatory decree and the collective agreement referred to in the *proviso* of § 5 may adopt, as administrative regulation in force or as an independent agreement between employers and employees, the same standards regarding a 40-hour workweek, eight hours daily and time and a half pay in excess of forty hours weekly

and of eight hours daily established by the *Provided* clause of § 5 of Act No. 379 of May 15, 1948, for the industries covered by the Fair Labor Standards Act of June 25, 1938, as amended or they may decree or agree upon other standards which may be more beneficial for the laborer. The standards which are permanently incorporated into our labor contract as basic legal requirements are those contained in the *proviso* of § 5 of Act No. 379 of May 15, 1948, and they form part of any labor contract for industries or businesses covered by the Fair Labor Standards Act of 1938, but said standards, we repeat, may be improved on behalf of our laborer, without being contrary to any of our laws.

Regarding compensation at double rate for overtime paid in the case of The Porto Rico Coal Co. *et al.*, it was based on a conclusion of the trial court dealing with a local industry, governed by a decree, and which after examining the change of the exemptions as to hours for seamen made to § 13 of the Fair Labor Standards Act, the classification of the tasks concerning the maritime industry adopted by our own legislature upon establishing a minimum wage for said industry and the lack of an agreement on other working conditions and the threefold specialty of the case under study, did not appear to be so groundless as to justify our reversal thereof.

The judgment entered by the Superior Court of Puerto Rico, San Juan Part, on October 18, 1963 should be affirmed, except regarding shift No. 1—11:01 p.m. to 7:00 a.m.—in which the petitioners worked during the seven calendar days and, therefore, they are entitled to be compensated at double time for the hours worked on the seventh day, it being improper as a question of fact and of law.

—O—

MR. JUSTICE SANTANA BECERRA, with whom MR. CHIEF JUS-
TICE NEGRÓN FERNÁNDEZ, MR. JUSTICE BELAVAL, and
MR. JUSTICE HERNÁNDEZ MATOS concur, dissenting opin-
ion in part.

San Juan, Puerto Rico, March 15, 1966

The appellant Caribbean Refining Co. is an enterprise in
interstate commerce. Its production compels it to work 7 days
a week and 24 hours a day. The workday is divided into three
shifts of 8 hours each, the first from 11:00 P.M. to 7:00 A.M.,
the second from 7:00 A.M. to 3:00 P.M. and the third from
3:00 P.M. to 11:00 P.M. Up to January 11, 1956 the work
program of appellant consisted of 5 consecutive working days
and 2 consecutive days of rest. So far, this litigation would
never have arisen. On January 11, 1956 the appellant aban-
doned the previous program and established one of six con-
secutive working days and 2 consecutive days of rest. Here
arose the reason for the litigation, inasmuch as it may be
easily seen that such work and rest program thus integrated
covers an 8-day period, that is, it exceeds the natural 7-day
week into which time is divided.

On March 18, 1957 the appellant and its employees ne-
gotiated a collective agreement. Insofar as pertinent herein
said agreement provided: (Art. IV):

"(a) *Workweek.*—For employees who regularly work in
the daytime the workweek shall consist of 168 consecutive hours
beginning at 12:01 A.M. on Monday and ending at 12 noon the
following Sunday.

"For those employees who work shifts, the workweek shall
start at the beginning of that regularly fixed shift which starts
on or before 12 noon on Sunday and ends the following Monday
morning. Said workweek shall consist of 168 consecutive hours
ending the following Sunday at the time of its beginning.

"(b) *Working day.*—The normal working day shall consist
of eight (8) hours of work during any period of twenty-four

(24) consecutive hours.

"(d) *Shifts.*—Hereby, and until further notice from the Company, the following schedules shall be observed:

. . . . . . . .

EMPLOYEES WORKING SHIFTS

| *Shift* | |
| --- | --- |
| No. 1 | 11:00 P.M. to 7:00 A.M. |
| No. 2 | 7:00 A.M. to 3:00 P.M. |
| No. 3 | 3:00 P.M. to 11:00 P.M." |

Said agreement stated that any overtime in excess of eight hours a day and of 40 hours in any week shall be compensated at time and a half and at double time any hour worked on the seventh consecutive working day.

In view of the transcendental consequences that, according to our records, are sought to be attached to this case, especially by the *amici curiae* who have joined forces with the appellant in support of the reversal of the judgment entered by the Superior Court which upheld the laborers in their claim on appeal; fearing the alleged adverse and disturbing effect attributed in the record to the judgment under review, if upheld, upon the industry in Puerto Rico, and, considering that in a great measure the question at issue here has been plucked from its limited range and carried to proportions it actually does not have in the discussion shown by the record of such issue together with the ever-present problem of the adequate adjustment between the local and the federal labor legislation in the controversies regarding wages—which problem in my opinion does not actually have much to do in the present controversy—it seems to me that it is necessary and appropriate to set forth the controversy in what it actually is, and that it be known what the issue involves and what it does not involve before the Court as it was adjudged. Let us see:

On July 29, 1958 a group of 58 laborers of the appellant, joined later by many more, filed a complaint alleging that

the appellant had requested them to work in a rotating shift as set forth in a work program attached to the complaint, as to which there is no dispute. That on several occasions, following said work program, the complainants had been requested to work during six consecutive days a week without having been paid the overtime in excess of 40 hours a week, at time and a half. They also alleged that on countless occasions they had been requested to work on the day of rest and that said overtime was not compensated at double time. In its answer the appellant denied these facts although it admitted the existence of the work program attached to the complaint. It raised a series of affirmative defenses. The trial court held a hearing on the questions of law involved in the suit and received evidence regarding said questions of law. On September 18, 1959 it entered judgment.

The trial court decided, correctly,[1] that by starting the workweek immediately after the day of rest, the week in an industry covered by the Federal Fair Labor Standards Act ends when the laborer has worked 40 hours; and if said 40 hours were worked in 8-hour periods daily, those worked after the fifth day would be overtime and the employer is required to pay them at time and a half pursuant to the *Provided* clause of § 5 of Act No. 379 of 1948. The court concluded, correctly, in the light of the evidence, that in appellant's work program the 6 consecutive work days would fall only twice every 8 weeks within the workweek and that in its practical operation the workweek created by the defendant always consisted of six 8-hour days. In its judgment the court ordered the appellant to pay the amounts in arrears on the basis of compensating the hours worked during the sixth consecutive workday starting from the day immediately following the day of rest, *at time and a half,* and the hours worked by

---

[1] See Code of Federal Regulations of the Fair Labor Standards Act, § 778.2 (c), (d); and *Ponce* v. *Fajardo Sugar Co.,* 85 P.R.R. 575 (1962), cited many times by the appellant itself with approval.

the complainants during the day of rest, seventh day, at double rate. Appellant was ordered to pay the amount of $35,733.37 for the compensation at time and a half for the sixth consecutive day of work; $12,962.89 for the seventh day or the day of rest worked concerning shift No. 1, less $3,578.89 to be deducted for compensation received, which makes a total of $45,117.37, in addition to the penalty imposed by law and attorney's fees.

So as not to be further concerned with it, I want to state right now that the complainants are not entitled to the extra compensation of $12,962.89 ordered by the court for work performed during the seventh day or day of rest, and in that aspect I agree with the opinion of the Court (Part III). To claim for work performed in the day of rest, the complainants divided the first shift from 11:00 P.M. to 7:00 A.M. in two different workdays, one covering the hour from 11:00 to 12:00 and another the remaining 7 hours. That is improper inasmuch as the 8-hour workday started at 11:00 P.M. and not at 12:00. I shall continue to state my opinion only with respect to compensation at time and a half for the sixth consecutive day of work.

Below is the workweek and the program established by the appellant and which is not in dispute:

| "Workweek: | S | M | T | W | T | F | S | Hours worked |
|---|---|---|---|---|---|---|---|---|
| (1) | x | x | x | x | x | x | o | 48 |
| (2) | o | x | x | x | x | x | x | 48 |
| (3) | o | o | x | x | x | x | x | 40 |
| (4) | x | o | o | x | x | x | x | 40 |
| (5) | x | x | o | o | x | x | x | 40 |
| (6) | x | x | x | o | o | x | x | 40 |
| (7) | x | x | x | x | o | o | x | 40 |
| (8) | x | x | x | x | x | o | o | 40 |
| (9) | x | x | x | x | x | x | o | 48" |

(x)  days worked
(o)  days not worked

A study of the preceding table which represents the work-week established by the appellant, as already stated, starting at 11:00 P.M. on Sunday and ending 168 hours afterwards (7 days of 24 hours each) at 11:00 P.M. of the following Sunday gives rise to several remarks and calls for several conclusions:

(1) Unlike the rest, the ninth week reproduces a situation identical with the first. The situation develops, therefore, in an 8-week cycle.

(2) In the first week of this cycle the sixth consecutive workday falls within a Sunday-to-Sunday range and, according to the evidence, extra pay was granted for said day.

(3) In the second week of the cycle the sixth consecutive workday falls on Saturday, within the Sunday-to-Sunday range and overtime was also paid for said day.

(4) In the third week of the cycle the sixth consecutive day of the work period falls out of the range of the Sunday-to-Sunday week and falls in the fourth week which follows, and said day merges or is identified with the first regular workday of the latter.

(5) In the fourth week of the cycle the sixth consecutive day of the work period falls in the fifth week which follows and merges or is identified with the second regular day of work of the latter.

(6) In the fifth week of the cycle the sixth consecutive workday in the work period falls in the sixth week which follows and merges or is identified with the third regular day of work of the latter.

(7) In the sixth week of the cycle the sixth consecutive day of work falls in the seventh week which follows and merges or is identified with the fourth regular day of work of the latter.

(8) In the seventh day of the cycle the sixth consecutive workday falls in the eighth week which follows and merges or is identified with the fifth regular workday of the latter.

It is an unquestionable fact and it was so testified by Mr. Eugene R. Cays, Vice-President of the company, that overtime was paid for the sixth day in weeks (1) and (2) but not in weeks (3), (4), (5), (6), (7) and (8). (Tr. Ev. 87, 88 *et seq.*) A study of the table shows that, apparently, the Company did not consider itself bound to pay work at time and a half within the representative period of said 8 weeks, in addition to the overtime in the first two, inasmuch as there appear 40 hours a week. There lies what is artificial of the situation in detriment to the worker.

The 40 hours weekly in the third to eighth weeks part from the premise, uncertain in this case, that the workweeks of the laborer started always on Sunday with the calendar week, and ended therewith. The unquestionable facts in the record show that such was not actually the case as of January 11, 1956 when the initial schedule of 5 consecutive days of work and two days of rest, 7 calendar days, was abandoned, and substituted by that of 6 *consecutive* workdays and two *consecutive* days of rest, 8 natural consecutive days.

The beginning of the workweek is marked by the return to work, irrespective of the day, to normal work after the preceding unit period of work and rest. In this case the workweek of the workers started when they returned to normal work after six consecutive workdays and two consecutive days of rest. It was inevitable, therefore, albeit very logical chronologically speaking, that the initial day of the week be moved each time under a schedule which covered 8 natural consecutive days of work and rest as a whole, and not seven. Notice in the chart how the first workday in the second week, after the rest, could not fall again on Sunday as in the first, but on Monday, and that of the third week does not start on Monday, but on Tuesday, and so forth. In a representative period of 8 weeks each workweek began on a different successive day. The incontrovertible facts show that that was the reality for the laborer, not the artificial position

assumed by the appellant regarding the compensation, that every workweek started on a Sunday and ended next Sunday. The result of this unreal position is that there are workweeks which begin with rest instead of work (2nd and 3rd), or days of rest after only one workday (4th), or of 2, 3 and 4 days (5th, 6th and 7th), contrary to reality and its own schedule which established 6 consecutive workdays. Dividing thus artificially the workweek of the laborer for payroll purposes to make it appear as starting anew without having elapsed, every Sunday the sixth consecutive day actually and effectively worked in a week was represented as a regular workday of the following week. In this case the workday was not less than 8 hours (collective agreement) and therefore 5 consecutive days represented 40 hours of work. That being the case, the 6th consecutive day worked by the laborer constituted an excess of 40 hours.

Parting from the first week which started on Sunday, the undisputable evidence in the record, which is the chart, belies any pretense of the Company in the sense that the laborers did not always work 6 consecutive days—8 hours in excess of 40—before enjoying their rest periods before starting the next workweek all over again. During the lapse of time representative of 8 weeks, the chart shows as an undisputable fact that every two months there were worked seven weeks or periods of 6 consecutive workdays or excess of 40 hours, and in 5 of said weeks the sixth day or excess of 40 hours was not compensated at time and a half under the artificial pattern of calendar week applied by the appellant.

Section 7(a) of the Fair Labor Standards Act of Congress—29 U.S.C.A. § 207—provides that except as otherwise provided in this section, no employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employ-

ment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

The federal Regulation of this Act, § 778.2 provides in its subsection (c) that an *employee's* workweek is a fixed and regularly recurring period of 168 hours—*seven consecutive 24-hour periods.* (Italics ours.) "It need not coincide with the calendar week but may begin on any day and at any hour of the day." (See, *Ponce,* aforecited.) "Once the beginning time of an *employee's* workweek is established, it remains fixed regardless of the schedule of hours worked by him. The beginning of the workweek may be changed if the change is intended to be permanent and is not designed to evade the overtime requirements of the Act."

Subsection (d) of the Regulation itself provides that each workweek stands alone; that the Act takes a single workweek as its standard and *does not permit averaging of hours over two or more weeks,* and that this is true regardless whether the employee works on a standard or swing-shift schedule.

I do not assume the position of holding that the swing-shift schedule established by the appellant was in violation of the Act and the federal regulation just for that fact alone. The problem does not lie in the swing-shift schedule. The problem lies in the fact that in each 168-hour period—7 periods of 24 hours—which is the unit labor measure of the Fair Labor Standards Act, and independently of which day of the week those 168 hours began to elapse until completely expired to begin anew, the laborers worked 8 hours—a sixth day—in excess of 40, without, as provided by § 7, being compensated at time and a half, except on the two occasions in 8 weeks in which under the fictitious representation of

the calendar week, the lapse of the 168 hours coincided with the lapse of the calendar week which coincidence the Regulation expressly provides need not exist.

The payment of wages on the basis of a fictitious workweek from Sunday to Sunday accomplished by the mechanism of artificially dividing the laborer's actual consecutive 6-day workweek into different calendar workweeks was contrary to law and to the federal regulation which does not permit such separation. The Regulation takes every week or period of 168 consecutive hours alone, and separately, as the unit basis for determining the workweek in excess of 40 hours in each period worked. Otherwise, § 7 of the Act would be inoperative and its provision regarding overtime pay would be left to the capricious distribution which an employer would make of the period worked, causing any excess of 40 hours to disappear artificially, as in this case, in a basic period of 168 or a workweek.

Aside from the fact of whether or not the laborers asked for the swing-shifts,[4] and I already stated the problem does not lie therein, nothing in the record shows that under the system of 6 days of work, instead of the former 5 days, they agreed to or accepted the manner already described to compute their weekly wages. Any express or implied waiver of the additional compensation provided by § 7 on the excess of 40 hours would be contrary to the public interest and invalid. In the collective agreement they agreed, on the contrary, that every hour in excess of 40 hours would be paid at time and a half.

The Court observes that under the previous system, up to January 1956, the appellant was not bound to pay overtime and with the new system, "at least", had to pay 16 overtime hours every 8 weeks, as if the change inured to the benefit

---

[4] See Tr. Ev. also at page 90 *et seq.*

of the worker. That was correct at the beginning for the obvious reason that the laborer worked only 5 days in each 168-hour period, not more than 40 hours. Under the subsequent program the appellant established a 6-consecutive-day week of 8 hours of work daily, clearly in excess of 40 hours. During a period of 8 weeks it was bound to pay time and a half in seven periods worked or for 56 hours instead of for only 16 hours. The chart objectively reveals that reality, as well as the fact that the laborers always worked six consecutive days prior to enjoying the rest period and starting work again.

I consider that in this aspect the judgment entered by the trial court should not be reversed inasmuch as it is a realistic appraisal given in the light of those facts in the record. The claims for wages, as well as all those other controversies which thrive under the shield of a public policy with definite purposes, call for fundamentally practical approaches and results rather than the technical refinement, as well as the individuation of each case in the light of its particular facts and circumstances, in order to make more effective the public policy involved.

In our present economy, which to the Puerto Rican interest is primarily one of wages and consumption, the worker's wages are of utmost importance. It constitutes the vital flow of that economy. An interpretation or application of the law which in its practical effects bestows on wages the maximum protection provided by the applicable laws of the Congress and of the Commonwealth of Puerto Rico must be preferable inasmuch, as, aside from considerations, of human order, our worker consumes for its daily subsistence products from a country where the wages of workers more than double his own, it being necessary to absorb, as consumer, the burden of that higher salary in the cost of the product he consumes,

increased, furthermore, by the freight costs of the marine which also best compensates its workers.[5]

Because of certain evidence in the record of this Court on review, I consider it appropriate to clarify, as I mentioned at the beginning, that that has been the question at issue within its true limits and not beyond its own ambit. It is nothing more than an action to assert the rights of some laborers in interstate commerce to receive extra compensation at time and a half provided by § 7(a) of the federal Standards Act for each excess of 40 hours a week or 6th consecutive day they worked, which right they were denied by appellant under a particular manner of liquidating the workweek.

The judgment of the trial court involves no other problem of greater transcendency or complexity in the labor-management sphere. No claim was made nor extra compensation paid at a rate higher than the time and a half of § 7(a) of the federal Act. There is no question of minimum wage or of a mandatory decree or collective agreement regarding minimum wage; there is no controversy to be decided as to whether, as put in the words of an amicus curiae, "Is the existence of a collective or of a decree fixing the wages that should be paid in a factory or industry covered by the Federal Minimum Wage Act sufficient to make inapplicable the 'provided' clause of said § 5 of Act No. 379?", which question is said to affect industrialization greatly; neither does the controversy involve any problem concerning § 5 of Act No. 379 of 1948 and its "provided" clause in its relation to industries under the Federal Labor Standards

---

[5] Appearing before a subcommittee on Labor of the Senate, of the United States, Mr. David Dubinsky declared last August 14, that in February 1965, a year, the average wage in the manufacturing industries in Puerto Rico was $1.23, as compared to $2.59 in the United States, a difference of $1.36 an hour.—El Imparcial, September 6, 1965.

Act inasmuch as the right of said workers at time and a half stems from said federal § 7 and not from our Act; nor is there anything in the judgment of the trial court, if affirmed, in the face of the true controversy, as there was nothing either in that of *Porto Rico Coal Co.* v. *Superior Court*, 91 P.R.R. 84 (1964) which threatens the industrialization program of Puerto Rico, fear which is frequently adduced as a fifth argument in relation to the claims for wages and which without the necessary ground in the facts and without any sense of selection, could result in a good argument in the serene judicial disposition of these controversies. Basic as the industrialization program is for our country, not every wage controversy nor every judgment upholding a claim for wages as in the case at bar necessarily affects said program.[6]

This case might probably be a warning to workers in interstate commerce while bargaining collectively of the effects, regarding overtime pay of § 7 of the Fair Labor Standards Act, of a work schedule consisting of six consecutive days of work and two consecutive days of rest within the frame of the calendar week, like the one herein put into practice by the appellant.

In my opinion the judgment appealed from should be affirmed in this aspect.

---

[6] The case of the *Porto Rico Coal* merely involved the overtime pay in excess of 8 hours a day. There was no compensation problem for the workweek, either federal or local. As seamen, those workers were expressly excluded by the Fair Labor Standards Act itself of any protection regarding overtime pay. Before such situation in which the workers were left outside of the radius of federal action we were at liberty to grant them the maximum protection provided by our legislation and we compensated them at double time the work performed in excess of 8 hours a day.